2007 UT 14

**STATE of Utah, Plaintiff and Appellee,**

v.

**Warren Clifford HALES, Defendant and Appellant.**

**No. 20050131.**

Supreme Court of Utah.

Jan. 30, 2007.

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Janis K. Macanas, Asst. Att'ys Gen., Salt Lake City, for plaintiff.

James C. Bradshaw, Mark R. Moffat, Ann Marie Taliaferro, Salt Lake City, for defendant.

DURRANT, Justice:

### INTRODUCTION

¶ 1 In December 1997, Luther Deem ("Luther") died at the age of twelve due to complications from severe brain injuries that he sustained in December 1985 as a five-month-old infant. In February 2000, a little more than two years after Luther's death, the State charged Defendant Warren Hales with murder, alleging that in 1985 Hales shook

the then-infant Luther violently, causing his brain injuries. A jury convicted Hales of murder, and the district court denied his subsequent motion for a new trial.

¶ 2 On appeal, Hales asserts two claims that would lead to the vacation of his conviction and nine claims that would lead to a new trial. We address both of the claims that could independently serve as the basis for the vacation of his conviction: (1) that the lengthy delay and the loss and destruction of evidence in this case violated his federal due process rights and (2) that the State presented insufficient evidence that Hales acted with the state of mind necessary to commit murder. We conclude that Hales's federal due process rights were not violated by his delayed prosecution or by the loss of evidence in this case and that the State presented sufficient evidence that Hales acted with the state of mind necessary to commit murder.

¶ 3 As to the nine claims that would result in a new trial, we address only Hales's claim that he received ineffective assistance of counsel because we grant a new trial on that basis. We agree with Hales that his trial attorneys provided ineffective assistance of counsel in failing to retain a qualified expert to examine CT scans of Luther's brain injuries and that this failure was prejudicial. The CT scans of Luther's brain injuries were crucial to the State's case against Hales, and a reasonable investigation of this case would necessarily have included an examination of the CT scans by a qualified expert. Further, because there is a likelihood that Hales's attorneys would have discovered compelling evidence challenging the State's theory regarding the timing of the injuries if they had hired a qualified expert to read the CT scans, their failure to hire such an expert prejudiced Hales. Accordingly, we remand for a new trial.

## BACKGROUND

¶ 4 Twelve-year-old Luther Deem died on December 12, 1997, from aspiration pneumonia and infection resulting from brain injuries that he sustained twelve years earlier, in December 1985, when he was a five-month-old infant. Due to those brain injuries, Luther spent nearly all of his life in a persistent vegetative state. Although he was able to go home from the hospital in January 1986 and could breathe without a ventilator, he was blind, he could not walk or talk, and he was fed through a feeding tube for much of the remainder of his life.

¶ 5 On February 29, 2000, two years after Luther's death, the State formally accused Hales of shaking Luther while babysitting him on the night of December 5, 1985, and thereby causing the brain injuries that eventually killed Luther. The State charged Hales with murder, a first degree felony.

## I. DECEMBER 1985

¶ 6 Hales met Luther's mother, Michelle Westerman, when Luther was two and one-half months old, and they moved into an apartment together soon after. When Luther was five months old, on the evening of December 5, 1985, Hales returned home from work after Westerman had put Luther to sleep in his crib. Upon Hales's arrival, Westerman asked Hales to go to the grocery store. Instead of going himself, Hales loaned his truck to Westerman and stayed home with Luther. Westerman was gone for approximately 20 to 30 minutes. By the time she returned, Luther had been taken by ambulance to Cottonwood Hospital.

¶ 7 Hales testified that after Westerman left, he lay down on the couch. He then heard Luther make noise in the bedroom, like "he was fussin'." Hales went to Luther's bedroom and tried to give Luther a pacifier, but Luther would not take it. Hales then noticed that Luther was gasping for air and that his eyes had rolled back in his head. Hales picked Luther up and tried to revive him by calling his name, slapping his face, and turning him over and patting him on the back. When nothing seemed to help, Hales put Luther down on the ground and ran to Westerman's brother's nearby apartment to call 9–1–1 and get help. Westerman's brother, Paul Deem, also attempted to revive Luther.

¶ 8 Within five minutes of the 9–1–1 call, the ambulance arrived and took Luther to Cottonwood Hospital. Luther was admitted to Cottonwood Hospital at 7:34 p.m., and a

CT scan of his brain was performed between 8:41 p.m. and 8:45 p.m. He was then life-flighted to Primary Children's Hospital ("Primary Children's").

¶ 9 Meanwhile, Hales waited for Westerman to return. He was outside jumping up and down when she pulled up. Before she stopped the truck, he opened the driver's side door and told her to "scoot over." Hales first drove Westerman to Cottonwood Hospital. Then, from there, he drove her to Primary Children's.

¶ 10 Doctors determined that Luther had brain swelling and retinal hemorrhaging and that his injuries were likely nonaccidental and caused by shaken baby syndrome. They noted bruising on Luther's face, but there was no evidence of an impact injury, no neck injury, no injuries to the trunk of his body, and no healed fractures or similar evidence of prior abuse. Additionally, there were no identifiable finger or hand marks on Luther.

¶ 11 Midvale City police officers were alerted that Luther had sustained severe brain injuries likely caused by child abuse, and they began to investigate both Hales and Westerman. According to Westerman's testimony at trial, there was a police officer in the room when the doctor on call, Dr. Allred, first told her that Luther's injuries were caused by child abuse. Westerman reacted by swearing at Dr. Allred, exclaiming that she had never hit her son. Someone said, "Not you, your boyfriend." Westerman then "lost her cool" and either grabbed the police officer's gun and pointed it at Hales or "just held her fingers [to] him"—she could not remember at trial because she said it seemed like a dream. But she admitted telling an investigator from the Attorney General's Office that she had taken the gun. According to Westerman, the officer then threw her up against the wall and nearly handcuffed her for threatening Hales's life, but Dr. Allred intervened. Dr. Allred observed that Westerman's child was injured and that she was "not in her right kind of mind."

¶ 12 During the initial police investigation, Westerman and Hales were read their rights, interviewed, and given polygraphs. Neither Hales nor Westerman was arrested. At that time, Hales appears to have given a version of events similar to what he gave at trial. But on direct examination at trial, he admitted that he had previously described his actions, which actions he demonstrated to the jury, as "slapping" and "shaking" Luther. And on cross-examination, Hales agreed that in an earlier statement he had said that Luther was "squirming" and fussing before he went into Luther's room.

¶ 13 Despite Westerman's initial reaction at the hospital, she subsequently defended Hales. Westerman told the police and hospital social worker Annie Bates that she had never seen Hales harm Luther, that Hales loved Luther like a son and considered himself his father, and that she believed he would not hurt Luther. She told Detective Hodgkinson of the Midvale City Police Department that Hales had said to her on the way to Cottonwood Hospital that he was sorry "but didn't know what to do." She also told Detective Hodgkinson about a fight that she had had with Hales a few days prior, on December 2, 1985, regarding whether she should go out with her friends despite his wanting her to stay home.

¶ 14 Westerman's later testimony at trial diverged from the statements she had made in 1985. Westerman testified that Hales was reluctant to take responsibility for Luther and was inconvenienced by him; that she and Hales had argued on December 2, 1985, because she would not let him and a friend do "acid" in the apartment; and that Hales left the apartment saying, "Michelle, I'm going to hurt you" and stayed out all night. She also testified that while Hales was driving to Cottonwood Hospital, he said "he was sorry he did it" and that, while driving from Cottonwood Hospital to Primary Children's, Hales delayed by stopping four or five times along the way.

¶ 15 At trial, Hales testified that while driving to Cottonwood Hospital he had told Westerman "[t]hat something had happened, something was wrong with [Luther]. And I told her ... what I'd done and, you know, that I had tried everything I could for him." Hales did not recall stopping on the way to Primary Children's but said that, at the most, he might have stopped for gas. He

also denied using acid, having the argument about acid, threatening Westerman, and staying out all night.

## II. NEAR–MISS CAR ACCIDENT

¶ 16 During the initial police investigation and at trial, Hales explained that the bruising on Luther's face was from a near-miss car accident that had happened two days earlier, on December 3, 1985, while he was driving Luther to the home of Westerman's sister, Sheryl Merrell. On that day, Westerman started a new job with a new schedule that required Hales to drop her off at work and then to drop Luther off at Merrell's home. According to Hales, while he was driving Luther to Merrell's house after dropping Westerman off at her job, a car pulled out in front of his truck and caused him to slam on his brakes. Out of the corner of his eye, he saw Luther, who was strapped into a baby carrier but not belted into the car, hit the dash and fall onto a pile of carpenter's tools on the floor. Hales pulled over, took the screaming Luther out of his carrier, and tried unsuccessfully to comfort him. Hales then strapped Luther back into the carrier and took him to Merrell's house.

¶ 17 Merrell testified that when Hales arrived that day, Luther was crying and had a half-moon-shaped red mark on the side of his left eye. She picked Luther up, and he clutched her. When Merrell asked what had happened, Hales told Merrell that Luther had fallen and hit the dashboard. While Merrell was caring for Luther over the course of the day, the bruising on Luther's face spread over his forehead and face. But Luther played, ate, and interacted with Merrell.

¶ 18 The next day, Luther was still bruised and fussy, and he threw up a couple of times, but he was otherwise "acting okay." Two days after the bruising appeared, on the morning of December 5, Westerman took Luther to his pediatrician, Dr. Frank Bentley. Dr. Bentley found that Luther had a mild injury to his head and a fever caused by an ear infection. It was later that same day that Luther was rushed to the hospital while in Hales's care.

¶ 19 At trial, Westerman countered Hales's testimony about the near-miss car accident by testifying that when Hales dropped her off at work, Luther was strapped into his carrier and his carrier was strapped into the seatbelt of the car.

## III. INVESTIGATION AND PROSECUTION

¶ 20 At the beginning of January 1986, the Salt Lake County District Attorney's Office screened the case and declined to prosecute Hales on child abuse charges, noting lack of evidence of intent. A short time later, on January 28, 1986, Midvale City Police reopened the case to aid in a possible civil suit by Westerman. They gave Westerman copies of the files that had previously been prepared. The criminal case was then closed once more in February 1986. Westerman apparently never went forward with her civil action.

¶ 21 On December 3, 1987, the Utah Attorney General filed a civil lawsuit against Hales, seeking to recover the costs that the State had incurred for Luther's care. The State took depositions of Hales, Westerman, and Dr. Bentley. But this case also languished, and the docket entries end without explanation on September 20, 1991.

¶ 22 The State did nothing further until Luther died on December 12, 1997. After Luther's death, the matter was again referred to the Salt Lake District Attorney's Office. In January 1998, Jim Cope of the Salt Lake District Attorney's Office once again declined to prosecute, noting in the file that "the evidence considered at the original declination has not improved with age, and negligent homicide has a statute of only 4 years." Cope's note concluded by saying, "Prosecution of this case would be requiring a miracle, and I just haven't performed many lately." Sometime around February 2, 1998, the case was then referred by the Midvale City Police Department to the Attorney General's Office, where it sat for two years.

¶ 23 Finally, on February 29, 2000—about fourteen years after Luther sustained the brain injuries that left him in a vegetative state, but only a little more than two years

after Luther's death—the Utah Attorney General charged Hales with murder. Hales was arrested in March 2000.

## IV. LOSS AND DESTRUCTION OF EVIDENCE

¶ 24 During the fourteen years between Luther's initial injury and the filing of murder charges, some evidence was lost or destroyed. Retinal scans showing Luther's retinal hemorrhaging and audiotapes of the polygraphs administered to Hales and Westerman were lost; as was the case file of materials collected by the State for its civil case. Additionally, sometime prior to Cope's review of the case in January 1998, the original criminal investigation file containing the evidence and interviews initially collected by the Midvale City Police Department was destroyed by that Department.[1]

¶ 25 To reconstruct the case against Hales, the State contacted Westerman—who in 1986 had received copies of the documents in Midvale City's investigative file for purposes of her civil case—and made copies of the documents that she had retained. Westerman was also able to provide her deposition from the civil case. And Detective Hodgkinson (now a Sergeant) still had audiotapes of his initial interviews of Westerman and Hales. The State also obtained access to the original CT scans and medical records, which were still on file with the hospital. The State added to these materials by interviewing members of Westerman's family who had not previously been interviewed (or, at least, whose interviews were not recorded in the reconstructed file), including Paul Deem, from whom Hales had sought help on the night in question.

¶ 26 Aside from any unknown information that might have been available in the complete investigative file, it is known that the audio tapes of the polygraphs administered to both Hales and Westerman and the retinal scans are still missing. Hales has also identified possible witnesses who can no longer be found, including nurses and social workers who were involved in Luther's care and interacted with Luther's family. Hales specifically points to two witnesses whose absence he claims caused him prejudice: Annie Bates, a caseworker employed at Primary Children's who wrote a report regarding the injuries to Luther and had talked with Hales and with Luther's family members; and Mel Harwood, a Primary Children's caseworker who, according to the police reports, contacted police on December 20, 1985, to report that the hospital had concerns about Westerman and to request that Westerman take a polygraph. Hales also suggests that a few other unavailable sources and potential witnesses might have had information but does not specifically state how they would have helped him. Finally, Hales challenges the failure of the Medical Examiner's Office to perform an autopsy after Luther's 1997 death.

¶ 27 Based on the lengthy delay in prosecution, combined with the loss, destruction, and erosion of evidence in this case, Hales filed a pretrial motion to dismiss the action for violations of his due process rights. On October 28, 2002, the district court entered a memorandum decision in which it rejected Hales's due process arguments because Hales did not prove that the State delayed for the purpose of gaining a tactical advantage. The court found that "[t]he record contain[ed] no evidence to suggest that the government intentionally withheld its filing of the criminal charge to purposefully gain any specific tactical advantage over [Hales]." It continued,

> Nothing here suggests that the State was attempting to destroy exonerating evidence or increase [its] chance to prosecute the Defendant. In fact, the decision to defer charging the Defendant until now has left the State at a distinct tactical disadvantage, since the State bears the burden of proving the charge of murder.

## V. CT SCANS

¶ 28 At both the preliminary hearing and at trial, the State's case against Hales was

---

1. Although in initially ruling on Hales's motion to dismiss based on his due process claims the district court noted only that the files were destroyed sometime between 1986 and 2001, Hales's attorney had stipulated at oral argument on the motion that the criminal investigation file was destroyed prior to Cope's review, which occurred in January 1998.

based, in large part, on expert interpretation of the CT scans. The State's expert, pediatric neurosurgeon Dr. Marion Walker, testified based on a combination of the CT scans and the evidence of retinal hemorrhaging that Luther suffered from shaken baby syndrome. In testimony interpreting the CT scans, he noted that the injuries depicted were global rather than localized and thus were not consistent with an impact to one part of the brain; that the force required to cause these injuries to a baby's brain from shaking would be violent force; and that they would have caused immediate unconsciousness with no possibility of a "lucid interval."

¶ 29 Despite the importance of this evidence to the State's case, Hales's trial attorneys opted not to have an expert look at the CT scans until the morning of trial, and even then, the defense expert who looked at the CT scans was found by the district court to be unqualified to interpret them. Instead, Hales's trial attorneys focused on their theory that the near-miss car accident caused Luther's injuries. They called a forensic pathologist, Dr. John Plunkett, who testified that shaking can cause neck injury, but not brain injury, and therefore, the most likely cause of the injuries was the impact from the near-miss car accident that caused the bruising followed by a lengthy "lucid interval." A jury convicted Hales of murder, and he was sentenced to five years to life in prison.

¶ 30 After Hales's conviction, he acquired new counsel and moved for a new trial on multiple grounds. Hales claimed, among other things, that his trial attorneys rendered ineffective assistance because they failed to investigate the CT scans.

¶ 31 In support of his motion, Hales submitted an affidavit from pediatric neuroradiologist Dr. Patrick D. Barnes in which Dr. Barnes opined that the initial CT scan taken at Cottonwood Hospital on December 5, 1985, between 8:41 and 8:45 p.m. shows a change in cell structure that is "specifically observable in what is referred to as changes in gray/white differentiation." According to Dr. Barnes, "[a]lthough there is some variability, edema and changes in gray/white differentiation will not appear in a CT scan until at least 6 to 12 hours after the initiating insult." If believed by a jury, this testimony would establish that the injury to Luther most likely happened prior to the time he was in Hales's care on the evening of December 5, 1985. According to the records, Luther was admitted to Cottonwood Hospital's emergency room at 7:34 p.m., and police reports indicate that the incident occurred at 7:03 p.m. Hales was with Luther for just 20 to 30 minutes. If the injury occurred six hours prior to the initial CT scan, it would have occurred around 2:45 p.m., while Hales was at work.

¶ 32 Dr. Barnes also concluded, contrary to Dr. Walker's testimony, that the CT scans of Luther's brain do not indicate the cause or violence of the initial injury; that there was nothing in the scans to indicate how fast the onset of symptoms occurred; and that there is nothing in the scans inconsistent with a "lucid interval" after the injury.

¶ 33 The district court denied Hales's motion for a new trial, and Hales appealed both the denial of this motion and his conviction to this court. He raises eleven issues on appeal: (1) federal due process; (2) ineffective assistance of counsel; (3) insufficient evidence; (4) newly discovered evidence; (5) improper admission of unfounded scientific expert testimony; (6) improper jury instructions; (7) improper exclusion of a witness; (8) improper trial court conduct; (9) failure to sentence to a lesser degree of offense; (10) prosecutorial misconduct; and (11) cumulative error. We have jurisdiction pursuant to Utah Code section 78-2-2(3)(i).

**STANDARD OF REVIEW**

¶ 34 In this opinion, we address three of the issues presented by Hales: (1) whether his right to due process was violated; (2) whether the evidence of his state of mind is sufficient to support his conviction; and (3) whether he received ineffective assistance of counsel. Hales initially raised his due process claim before the district court in a motion to dismiss. He raised the other two claims in his motion for a new trial.

¶ 35 The due process claim presents a mixed question of fact and law that we re-

view de novo for correctness.[2] But "we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations."[3]

¶ 36 As for Hales's claim of insufficient evidence, " 'we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury.' "[4] We will reverse the jury's conviction only if " 'the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted.' "[5]

¶ 37 Finally, with regard to Hales's ineffective assistance of counsel claim, "we review for correctness the trial court's application of the law to the facts."[6] Therefore, "when reviewing the denial of a motion for a new trial based on an ineffective assistance of counsel claim, we defer to the trial court's factual findings unless clearly erroneous, but remain free to make an independent determination of a trial court's conclusions."[7]

## ANALYSIS

I. HALES'S FEDERAL RIGHT TO DUE PROCESS WAS NOT VIOLATED BY THE STATE'S DELAY IN FILING CHARGES OR BY THE LOSS AND DESTRUCTION OF EVIDENCE

¶ 38 We first address Hales's argument that the State violated his right to due process under the United States Constitution by delaying fourteen years before formally charging him with a crime, during which time the initial investigative file was destroyed and evidence that would have been available when Luther was injured in 1985 was lost. Hales makes his due process arguments with reference only to the United States Constitution and cases interpreting federal law; so we interpret his briefs to waive any due process claims under our state constitution, and we analyze his claims solely under federal due process precedents.[8] We conclude that Hales has not established that his prosecution violated his federal due process rights because the delay between Luther's death in December 1997 and the filing of charges in February 2000 was only a little over two years, the delay or destruction of evidence was not undertaken in bad faith, and Hales has shown only that the evidence that was lost or destroyed between 1985 and 2000 was, at most, potentially exculpatory.

¶ 39 The Fourteenth Amendment of the United States Constitution prohibits state governments from "depriv[ing any person] of life, liberty, or property, without due process of law."[9] In the context of criminal prosecutions, the United States Supreme Court has interpreted this to mean that the government must not offend "those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency."[10] But the Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly."[11] "[B]eyond the specific guarantees enumerated in

2. *Chen v. Stewart*, 2004 UT 82, ¶ 25, 100 P.3d 1177.

3. *Id.*

4. *State v. Hopkins*, 782 P.2d 475, 477 (Utah 1989) (quoting *State v. Petree*, 659 P.2d 443, 444 (Utah 1983)); *accord State v. Honie*, 2002 UT 4, ¶ 44, 57 P.3d 977.

5. *Hopkins*, 782 P.2d at 477 (quoting *Petree*, 659 P.2d at 444).

6. *Menzies v. Galetka*, 2006 UT 81, ¶ 58, 150 P.3d 480.

7. *State v. Brandley*, 972 P.2d 78, 81 (Utah Ct.App. 1998) (internal quotation marks omitted).

8. *See, e.g., State v. Rynhart*, 2005 UT 84, ¶ 12, 125 P.3d 938 (declining to reach a state constitutional claim because it was not adequately analyzed "as an issue separate and distinct from its federal counterpart").

9. U.S. Const. Amend. XIV.

10. *See United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (citation and internal quotation marks omitted).

11. *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990).

the Bill of Rights, the Due Process Clause has limited operation." [12]

¶ 40 These broad principles have been refined in what the United States Supreme Court has called "the area of constitutionally guaranteed access to evidence" [13] into at least three tests that apply to different fact situations in which a defendant is deprived of evidence that could be helpful to his defense. They are as follows: (1) the test developed in *Brady v. Maryland*[14] and *California v. Trombetta*,[15] which applies when the state fails to disclose material exculpatory evidence or destroys evidence whose exculpatory value was apparent; [16] (2) the test developed in *Arizona v. Youngblood*,[17] which applies when the state either destroys or fails to preserve "potentially exculpatory evidence"; [18] and (3) the test developed in *United States v. Lovasco*[19] and *United States v. Marion*,[20] which applies where loss of evidence is caused by the state's delay in filing formal charges against the defendant—commonly known as "preindictment delay" or "preaccusation delay." [21]

¶ 41 In his brief, Hales primarily presents his due process challenge to the delay and consequent destruction and loss of evidence in his case with reference to the test applicable to cases involving preaccusation delay. But he also argues that because the circumstances of this case do not fit neatly within the preaccusation delay jurisprudence, we should apply the overarching principle of fundamental fairness and hold that the State violated his right to due process. We will first address Hales's due process claim under the umbrella of preaccusation delay, and then discuss the merits of his generalized due process challenge.

## A. The State's Preaccusation Delay Was Constitutional

¶ 42 Hales initially claims that his right to due process was violated because the State declined to prosecute him until fourteen years after Luther was severely injured. We analyze the State's preaccusation delay, for its constitutionality under the Fifth Amendment of the United States Constitution [22] as it applies to the states through the Fourteenth Amendment.[23] The Sixth Amendment right to a speedy trial invoked in "postaccusation delay" cases does not apply in cases like this where prosecutorial delay occurs before there is a formal indictment, information, or arrest.[24] Until a formal charge or physical restraint is imposed on a citizen, "a citizen suffers no restraints on his liberty and is not the subject of public accusation," and thus, "his situation does not compare with that of a defendant who has been arrested and held to answer." [25]

¶ 43 In the context of oppressive preaccusation delay, the Due Process Clause "has a limited role to play." [26] "[S]tatutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide the primary guarantee against bring-

12. *Id.*

13. *Arizona v. Youngblood*, 488 U.S. 51, 55, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

14. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

15. 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

16. *See Youngblood*, 488 U.S. at 55–56, 109 S.Ct. 333 (citing *Trombetta*, 467 U.S. at 489, 104 S.Ct. 2528); *State v. Bakalov*, 1999 UT 45, ¶ 49, 979 P.2d 799.

17. 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281.

18. *Id.* at 57, 109 S.Ct. 333; *State v. Gulbransen*, 2005 UT 7, ¶ 46, 106 P.3d 734.

19. 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

20. 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

21. *Lovasco*, 431 U.S. at 788–89, 97 S.Ct. 2044; *Marion*, 404 U.S. at 324, 92 S.Ct. 455; *State v. Bailey*, 712 P.2d 281, 283 (Utah 1985).

22. *Marion*, 404 U.S. at 324, 92 S.Ct. 455.

23. *See The View Condo. Owners Ass'n v. MSICO, L.L.C.*, 2005 UT 91, ¶ 29 n. 5, 127 P.3d 697.

24. *Marion*, 404 U.S. at 320, 92 S.Ct. 455; *Bailey*, 712 P.2d at 283.

25. *Marion*, 404 U.S. at 321, 92 S.Ct. 455.

26. *Lovasco*, 431 U.S at 789, 97 S.Ct. 2044.

ing overly stale criminal charges."[27] Preaccusation delay implicates the United States Constitution only if it violates due process by offending "those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency."[28]

¶ 44 In *Lovasco* and *Marion*, the United States Supreme Court indicated that, at minimum, a due process violation would occur if a prosecutor delayed for the purpose of gaining a tactical advantage and the delay actually prejudiced the defendant.[29] But the Court held that due process would not be violated where a prosecutor delays for investigative purposes before bringing charges.[30] Although the United States Supreme Court has not ruled on whether something less than prosecutorial bad faith could ever trigger a violation of due process,[31] the large majority of the federal circuits have held that to succeed in a due process challenge based on

preaccusation delay, a defendant must show both (1) actual prejudice and (2) delay for the purpose of gaining a tactical advantage or for other bad faith motives.[32]

¶ 45 We have addressed preaccusation delay due process claims under the federal Constitution in three cases since the United States Supreme Court decided *Lovasco: State v. Smith*,[33] *State v. Bailey*,[34] and *State v. Wright*.[35] In the first two of these cases, we cited as authority *United States v. Revada*[36]—a case from the Tenth Circuit Court of Appeals that applied the above test adopted by the majority of federal circuit courts.[37] In the third, we cited as authority our previous two cases.[38] However, while our three cases consistently required a showing of actual prejudice, agreeing with the first prong of the majority test, our statements in these cases are inconsistent regarding whether the other prong of the test focuses on the State's *reason* for the delay[39] or on the *result* of the delay.[40] We therefore take the opportunity

---

27. *Id.* (internal quotation marks omitted).

28. *Id.; accord State v. Renzo*, 21 Utah 2d 205, 443 P.2d 392, 395 (1968) ("Undue delay in bringing one accused of crime before a magistrate is not, of itself, a denial of due process. It is only where a preliminary delay in some way deprives an accused of a fair trial that there can be a denial of due process.").

29. *Lovasco*, 431 U.S. at 795, 97 S.Ct. 2044; *Marion*, 404 U.S. at 324, 92 S.Ct. 455.

30. *Lovasco*, 431 U.S. at 790–96, 97 S.Ct. 2044.

31. *See id.* at 796–97, 97 S.Ct. 2044 (leaving to the lower courts the task of assigning in the first instance constitutional significance to non-investigative reasons for delay).

32. *See, e.g., Jones v. Angelone*, 94 F.3d 900, 905 (4th Cir.1996) (citing cases and concluding, "On the authority of [*United States v. Gouveia*, 467 U.S. 180, 192, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)], *Marion*, *Lovasco*, and *Youngblood*, every circuit, other than our own and the Ninth Circuit, has indeed held that, in order to establish that a lengthy pre-indictment delay rises to the level of a due process violation, a defendant must show not only actual substantial prejudice, but also that the government intentionally delayed the indictment to gain an unfair tactical advantage or for other bad faith motives." (internal quotation marks omitted)).

33. 699 P.2d 711 (Utah 1985) (per curiam).

34. 712 P.2d 281 (Utah 1985).

35. 745 P.2d 447 (Utah 1987).

36. *See Smith*, 699 P.2d at 713 (citing *United States v. Revada*, 574 F.2d 1047 (10th Cir.1978)); *Bailey*, 712 P.2d at 283 (same).

37. *Revada*, 574 F.2d at 1048 ("The rights of a defendant under the due process clause of the Fifth Amendment are not violated in the absence of a showing of actual prejudice resulting from the preindictment delay and that the delay was purposefully designed to gain tactical advantage or to harass the defendants.").

38. *Wright*, 745 P.2d at 450.

39. *See id.* ("Defendant has not alleged, and the facts do not suggest, that the prosecution delayed the filing of charges against him *in order to achieve* a tactical advantage." (emphasis added)); *Bailey*, 712 P.2d at 283 (noting that the "two-pronged test for establishing due process violation requires [a] showing of actual prejudice and purposeful delay" (citing *Revada*, 574 F.2d at 1047–48)).

40. *See Wright*, 745 P.2d at 450 ("We note that in order to constitute a due process violation, preaccusation delay must cause 'actual prejudice to the defendant's case and *result* in tactical advantage for the prosecutor.'" (emphasis added) (quoting *Smith*, 699 P.2d at 713)); *Smith*, 699 P.2d at 713 ("For preaccusation delay to consti-

presented by this case to clarify our intent to apply the majority test, which considers the *reason* for the delay, requiring the defendant to show both (1) actual prejudice *and* (2) bad faith.

¶ 46 We agree with the majority of circuits that delay does not violate a defendant's right to due process under the United States Constitution unless the State delayed in bad faith. We come to this conclusion in light of the United States Supreme Court's emphasis on the constitutional significance of a prosecutor's good or bad faith in *Arizona v. Youngblood.*[41] In *Youngblood,* the Court held that due process is violated by destruction of potentially exculpatory evidence only when the State destroys the evidence in bad faith.[42] In support of this holding, the *Youngblood* court cited *Lovasco* and *Marion* for the proposition that it had previously "stressed the importance for constitutional purposes of good or bad faith on the part of the government when the claim is based on loss of evidence attributable to the Government." [43]

¶ 47 We therefore reaffirm our prior use of the two-pronged test adopted by the majority of federal circuit courts in *Bailey*[44] and the appropriateness of our inquiry in *Wright* into whether the "prosecution delayed the filing of charges against [the defendant] *in order to achieve* a tactical advantage," [45] and we disavow the language in *Wright* and our per curiam decision in *Smith* suggesting that the federal due process test looks to whether preaccusation delay causes actual prejudice and *"result[s]* in [a] tactical advantage for the prosecutor." [46]

¶ 48 The result-oriented language that we initially used in *Smith* and repeated in *Wright* is not consistent with *United States v. Revada,*[47] the decision of the Tenth Circuit that we cited as authority. Further, it is not consistent with the United States Supreme Court's focus in *Lovasco* on the *reason* for the delay.[48] In *Lovasco,* the United States Supreme Court stated that "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and ... the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." [49] The Court then held that delay for an investigative purpose will not violate due process.[50] This is true regardless of whether the investigative delay *results* in a tactical advantage for the prosecutor.

¶ 49 As a matter of federal law, we therefore apply the two-pronged test adopted by the majority of federal circuits, which requires the defendant to show (1) actual prejudice and (2) delay for the purpose of gaining a tactical advantage or for another bad faith motive. We hold that the preaccusation delay in Hales's case did not violate Hales's right to due process under the United States Constitution because the delay caused no actual prejudice and the State did not delay in bad faith.

1. The Preaccusation Delay Did Not Cause Actual Prejudice

¶ 50 Hales argues that he was prejudiced by the fourteen-year delay between December 1985, when Luther suffered brain injuries, and February 2000, when Hales was charged with Luther's murder. But in so arguing, Hales misses the legal distinction between the murder charge that the State

tute reversible error, the delay must cause actual prejudice to the defendant's case and *result* in a tactical advantage for the prosecutor." (emphasis added) (citing *Revada,* 574 F.2d at 1048)).

41. 488 U.S. 51, 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

42. *Id.* at 58, 109 S.Ct. 333.

43. *Id.* at 57, 109 S.Ct. 333.

44. *Bailey,* 712 P.2d at 283.

45. *Wright,* 745 P.2d at 450 (emphasis added).

46. *Id.* at 450 (emphasis added); *accord Smith,* 699 P.2d at 713 (per curiam).

47. 574 F.2d 1047, 1048 (10th Cir.1978).

48. *United States v. Lovasco,* 431 U.S. 783, 790, 796–97, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

49. *Id.* at 790, 97 S.Ct. 2044 (citing *United States v. Marion,* 404 U.S. 307, 324–25, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)).

50. *Id.* at 796, 97 S.Ct. 2044.

ultimately brought against him after Luther died from the brain injuries in 1997 and the lesser charges that the State could have brought against him immediately after Luther was injured in 1985. Because the State could not charge Hales with Luther's murder until Luther died in 1997, the State actually delayed only two years before filing the murder charges. To conclude otherwise would be to interfere with the State's exercise of its prosecutorial discretion to decide which charges it would bring against Hales and would encourage prosecutors to bring lesser charges prematurely where a victim is likely to die of his or her injuries in order to avoid losing their ability to prosecute. To prove prejudicial preaccusation delay, Hales must therefore establish that he suffered prejudice due to the two-year delay after Luther's death. Hales cannot do so.

¶ 51 "Mere speculation about the loss of favorable evidence" is insufficient to support a claim of prejudice.[51] If a defendant claims prejudice because a certain document or a previously available witness is now missing or unavailable, the defendant must provide the "expected content" of the document or the witness's testimony and indicate how that document or witness would have aided the defense.[52] The defendant must also show causation by establishing that he could not have obtained the crucial evidence from another source and that the evidence would have been available if it were not for the government's delay in filing the charges.[53] Therefore, we reject Hales's claim that actual prejudice was caused by nonspecific negative effects of delay, including "changing versions of events," general prejudice from faded memories, and the "impossibil[ity]" of "assembl[ing] the missing pieces to a defense that would have been available two decades ago."

¶ 52 Hales's citations to Sixth Amendment postaccusation delay cases such as *Barker v. Wingo*[54] are inapposite. The case law is clear that it is improper to presume prejudice in the context of Fifth Amendment preaccusation delay claims as we do in the context of Sixth Amendment postaccusation delay claims.[55] Nebulous problems such as "faded memories" are inherent in any lengthy preaccusation delay, and we presume that they were considered by the legislature in deciding that there should be no statute of limitations for murder.[56]

¶ 53 Hales also claims, somewhat more concretely, that he was prejudiced by delay because the delay caused the loss of retinal scans of Luther's eyes showing retinal hemorrhaging and the loss of witnesses who might have cast some suspicion on Westerman. But Hales has not established that he would likely obtain favorable evidence from the retinal scans. And with regard to the witnesses, the most he has established is that one caseworker employed at Primary Children's, Mel Harwood, had sufficient concerns regarding Westerman to call police to ask that she take a polygraph test, but he does not know on what information this is based. He cannot tell us if it was based on a hospital worker's hunch, on mistrust of the mother, or on some evidence that would prove to be more substantial and useful at trial. Similar-

---

51. *State v. Mouser*, 806 P.2d 330, 337–38 (Alaska Ct.App.1991); *see also United States v. Crouch*, 84 F.3d 1497, 1515 (5th Cir.1996) ("Speculative prejudice does not suffice, and 'vague assertions of lost witnesses, faded memories, or misplaced documents are insufficient.'" (quoting *United States v. Beszborn*, 21 F.3d 62, 67 (5th Cir. 1994))).

52. *See Jones v. Angelone*, 94 F.3d 900, 908 (4th Cir.1996); *see also Crouch*, 84 F.3d at 1515 ("A mere loss of potential witnesses is insufficient absent a showing that their testimony 'would have actually aided the defense.'" (quoting *Beszborn*, 21 F.3d at 66)); *Mouser*, 806 P.2d at 337–38 ("At the very least, the accused must show that but for the delay, he would have been able to present favorable evidence.").

53. *Jones*, 94 F.3d at 908; *see also Crouch*, 84 F.3d at 1515 ("[L]oss of witnesses or documents occurring before delay becomes improper are not considered.").

54. 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

55. *See United States v. Marion*, 404 U.S. 307, 322–24, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *see also Jones*, 94 F.3d at 906–07 (reviewing cases and concluding that the concept of presumed prejudice "has no place" in the preaccusation delay due process analysis).

56. *See Marion*, 404 U.S. at 321–23, 92 S.Ct. 455.

ly, although Hales thinks that social worker Annie Bates's testimony would be useful, he provides no indication of what she would say. Therefore, even if both the retinal scans and the witnesses disappeared in the two-year period from December 1997 to February 2000 rather than during the initial twelve-year period from 1985 to 1997 (which seems unlikely), Hales has not been able to establish that the disappearance of that evidence caused prejudice.

■ ¶ 54 We also reject Hales's claim that he was prejudiced due to the destruction and reconstruction of the evidentiary file. Hales has not shown causation because he has not established that the file was destroyed during the two-year delay after Luther's death rather than during the prior twelve years. In fact, during the hearing on the motion to quash bindover, where Hales raised his due process claims, Hales's attorney told the district court that the file had been destroyed sometime prior to Cope's review of the file in January 1998, which review occurred less than a month after Luther's death. Furthermore, Hales is not able to point to any favorable information known to be missing from the file. The most Hales can say about the file is that it may have contained "potentially exculpatory evidence." A claim that potentially exculpatory evidence has been destroyed is better analyzed under the standard provided by *Youngblood,* as we discuss further in Part I.B.

■ ¶ 55 Similarly, we reject Hales's claim that he was prejudiced by the State's failure to conduct an autopsy after Luther's death in 1997. Regardless of whether Hales could satisfactorily explain how the missing evidence would have aided his defense, Hales cannot allege that the delay in charging Hales after Luther's death actually affected the State's choice not to conduct an autopsy because the State made that choice shortly after Luther's death and before any significant delay occurred. We therefore conclude that Hales has not proven sufficient facts to establish that he was prejudiced by the State's preaccusation delay.

### 2.  The State Did Not Delay in Bad Faith

■ ¶ 56 There is likewise no evidence that the State delayed for the purpose of gaining a tactical advantage or otherwise delayed in bad faith. In addressing Hales's motion to dismiss, the district court found that "[t]he record contain[ed] no evidence to suggest that the government intentionally withheld its filing of the criminal charge to purposefully gain any specific tactical advantage over [Hales]," and that "[n]othing here suggests that the State was attempting to destroy exonerating evidence or increase [its] chance to prosecute the defendant." In his briefs before us, Hales does not challenge these findings or otherwise allege that the State acted in bad faith, but claims only that he was prejudiced. We therefore hold that Hales has not established that the preaccusation delay in filing murder charges violated his right to due process under the United States Constitution. Having rejected his due process claim based on preaccusation delay, we now address his claim that the loss and destruction of evidence violate general principles of fundamental fairness.

### B.  Hales's Right to Due Process Has Not Otherwise Been Violated by Loss or Destruction of Evidence

¶ 57 Although Hales grounds his due process arguments almost exclusively on cases involving either preaccusation or postaccusation delay, Hales's plea that we consider the broader due process implications of this case prompts us to briefly consider the remaining branches of the analysis that we apply in the area of constitutionally guaranteed access to evidence.

■■ ¶ 58 Even when there is no delay, the State's loss and destruction of evidence can violate a defendant's due process rights in certain circumstances. The federal due process test that applies to the loss or destruction of evidence depends, however, on whether the defendant can prove that the evidence destroyed "possess[ed] an exculpatory value that was apparent before the evidence was destroyed"[57] or was only "poten-

---

**57.**  *California v. Trombetta,* 467 U.S. 479, 489,     104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

tially exculpatory." [58] At most, the evidence that Hales alleges was lost or destroyed was "potentially exculpatory" or evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." [59] Therefore, we turn to the federal due process test from *Youngblood,* under which a defendant carries the burden of showing that the State failed to preserve potentially exculpatory evidence and that it did so in bad faith. [60] As we have already noted, the district court found that the State did not act in bad faith, and Hales has not challenged this finding. The district court stated, "Nothing here suggests that the State was attempting to destroy exonerating evidence or increase [its] chance to prosecute the defendant."

¶ 59 In conclusion, Hales has not presented evidence that the erosion, loss, and destruction of evidence in this case violated his due process rights. Therefore, although the State's failure to retain evidence in this case was ill-advised, it was not so egregious as to rise to the level of a due process violation that would require us to vacate Hales's conviction. We therefore turn to Hales's argument that we should vacate his conviction for insufficient evidence.

## II. THE JURY'S VERDICT WAS SUPPORTED BY SUFFICIENT EVIDENCE OF DEPRAVED INDIFFERENCE

¶ 60 Hales next argues that there was not sufficient evidence that he acted with the state of mind necessary to convict him of murder and we should therefore vacate his conviction. We disagree. At trial, the State presented its murder case against Hales on two alternative theories: (1) that "intending to cause serious bodily injury to another, [he] commit[ted] an act clearly dangerous to human life that cause[d] the death of another" [61] or (2) "acting under circumstances evidencing a depraved indifference to human life, [he] engage[d] in conduct which create[d] a grave risk of death to another and thereby cause[d] the death of another." [62] The State needed to provide only enough evidence to satisfy either of these tests, and we review the evidence in the light most favorable to the jury's guilty verdict.

¶ 61 To convict a defendant of depraved indifference murder, which is not as difficult to prove as intentional murder, a jury must find that the defendant (1) "engaged in conduct which created a grave risk of death to another and that conduct resulted in the death of another—the actus reus"; (2) *"knew* that his conduct or the circumstances surrounding his conduct created a grave risk of death to another—the mens rea"; and (3) "acted under circumstances evidencing a depraved indifference to human life . . .—an evaluation of the actus reus." [63]

¶ 62 Viewed in the light most favorable to the jury's verdict, Westerman's testimony that Hales said, "I'm sorry I did it" while driving her to the hospital supports an inference that Hales believed that he had harmed Luther, but it is insufficient to support a reasonable inference that Hales confessed to inflicting the injuries intentionally or with depraved indifference. Therefore, all of the evidence relating to Hales's mental state is circumstantial. When determining whether a mental state is sufficiently supported by circumstantial evidence, we ask "(1) whether the State presented 'any evidence' that [the defendant] possessed the requisite intent, and (2) whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that [the defendant] possessed the requisite intent." [64]

58. *Arizona v. Youngblood,* 488 U.S. 51, 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

59. *Id.* at 57, 109 S.Ct. 333.

60. *Id.; State v. Gulbransen,* 2005 UT 7, ¶ 46, 106 P.3d 734.

61. Utah Code Ann. § 76–5–203(2)(b) (Supp. 1985).

62. *Id.* § 76–5–203(2)(c).

63. *State v. Bolsinger,* 699 P.2d 1214, 1219 (Utah 1985) (emphasis added); *accord State v. Powell,* 872 P.2d 1027, 1030 (Utah 1994).

64. *State v. Holgate,* 2000 UT 74, ¶ 21, 10 P.3d 346 (citations and internal quotation marks omitted).

¶ 63 In this case, the evidence regarding the injuries that Luther suffered constitutes the key circumstantial evidence as to Hales's mental state. At trial, Dr. Walker testified that Luther suffered a massive brain injury caused by shaken baby syndrome and that the injury shown on the CT scans must have been caused by "violent force." Further, because Westerman testified that Luther was fine when she put him to sleep and Dr. Walker testimony testified that Luther's brain injuries must have caused immediate unconsciousness, the jury could have inferred that Luther was fine until the 20 to 30 minutes that he spent with Hales on the night of December 5, 1985.

¶ 64 Combining this evidence, the jury could reasonably infer, consistent with logic and reasonable human experience, that Hales injured five-month-old Luther by violently shaking him, an act that created a grave risk of death to Luther and that resulted in Luther's death, that Hales knew his conduct presented a grave risk of death to Luther, and that the circumstances evidenced depraved indifference to human life. Regardless of Hales's degree of knowledge regarding the scientific theory of shaken baby syndrome, reasonable human experience indicates that an adult would know that violently shaking a five-month-old baby with less-developed neck control presents a grave risk of death to the baby.

¶ 65 In *State v. DeMille,*[65] we came to a similar conclusion in holding that the state of mind necessary for a murder conviction was satisfied by expert testimony regarding a child's injuries in a child abuse case. In that case, the evidence showed only that a three-year-old child was in the care of the defendant when she sustained a skull fracture and attendant brain injury that was caused by a blunt object striking "with a force equivalent to a fall from a two- or three-story building."[66] Here, as in *DeMille,* the jury was presented with evidence of nonaccidental injuries caused by violent force-evidence from which the jury could have reasonably inferred that the perpetrator knew that his conduct would create a grave risk of death and that he acted under circumstances evidencing depraved indifference to human life.

¶ 66 Further, in addition to the evidence regarding the nature of the injuries, Westerman testified to the following at trial: that Luther was an inconvenience to Hales; that two days prior to Luther's injuries, Hales had an argument with Westerman in which he told Westerman that he would "hurt" her; that Hales was the only person with Luther and that Luther was securely belted into Hales's truck when he sustained the bruising to his face; and that Hales was tired and did not want to be disturbed when he returned home from work on the night of December 5, 1985. Finally, Westerman testified at trial that Hales told her while driving to the hospital that he was "sorry he did it." This additional circumstantial evidence bolsters the physical evidence that Hales acted with knowledge that his conduct presented a grave risk of death to Luther. Accordingly, we hold that Hales's conviction was supported by sufficient evidence, and we turn to Hales's claim that he received ineffective assistance of counsel.

## III. HALES'S TRIAL ATTORNEYS RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THEY FAILED TO RETAIN AN EXPERT TO INTERPRET CRITICAL CT SCAN EVIDENCE DEPICTING LUTHER'S BRAIN INJURIES

¶ 67 Hales argues that his trial attorneys failed to adequately investigate the facts of his case in that they did not have a qualified expert examine the CT scans depicting Luther's brain injuries. He argues that he was prejudiced by this failure because, as a result, Dr. Walker's expert testimony that the CT scans showed an injury caused by violent shaking that would have caused immediate unconsciousness went unrebutted despite the availability of other possible interpretations. We agree.

¶ 68 As explained by the United States Supreme Court in *Strickland v.*

---

**65.** 756 P.2d 81, 83 (Utah 1988).

**66.** *Id.*

*Washington,*[67] the right to counsel embodied in the Sixth Amendment of the United States Constitution is a " 'right to the effective assistance of counsel.' "[68] A defendant is deprived of this right where his "counsel's conduct so undermine[s] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[69] Therefore, a defendant is entitled to a new trial because of ineffective assistance of counsel if he proves (A) "that counsel's performance was so deficient as to fall below an objective standard of reasonableness" and (B) "that but for counsel's deficient performance there is a reasonable probability that the outcome of the trial would have been different."[70] In this case, Hales has placed sufficient facts in the record to prove both of these prongs.

### A. Hales's Trial Attorneys Failed To Conduct an Adequate Investigation

■ ¶ 69 Because the State's interpretation of the CT scans was critical to the State's case against Hales, Hales's trial attorneys' failure to hire a qualified expert to review the CT scans constituted a failure to conduct an adequate investigation. In determining whether counsel's performance was objectively reasonable in light of all of the circumstances, we look to "prevailing professional norms."[71] In accordance with these norms, our cases recognize that counsel has an important duty to "adequately investigate the underlying facts" of the case[72] because investigation sets the foundation for counsel's strategic decisions about how to build the best defense. As explained by the United States Supreme Court in *Strickland,*

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.[73]

¶ 70 Accordingly, we review Hales's trial attorneys' decision not to investigate the CT scans to determine whether it constituted a reasonable professional judgment. In doing so, we attempt to "eliminate the distorting effects of hindsight" by adopting Hales's trial attorneys' perspective at the time of their decision to limit their investigation.[74] And we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [Hales] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."[75]

¶ 71 Hales has established in the record that his trial attorneys did not acquire the CT scans depicting Luther's brain injuries until the morning of trial and that they never subjected the CT scans to review by an expert qualified to interpret them. The reasons for this decision are not clear. Posttrial, Hales's appellate attorneys acquired access to the CT scans and obtained an expert opinion from a new expert, pediatric neuroradiologist Dr. Barnes, that contradicts the interpretation given by the State's expert, pediatric neurosurgeon Dr. Walker, and which suggests that Luther's injuries happened prior to the time when Hales was babysitting Luther. Accordingly, Hales moved for a new

---

67. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

68. *Id.* at 686, 104 S.Ct. 2052 (quoting *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)).

69. *Id.*

70. *State v. Gonzales,* 2005 UT 72, ¶ 64, 125 P.3d 878.

71. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

72. *Taylor v. Warden,* 905 P.2d 277, 283 (Utah 1995); *accord Rompilla v. Beard,* 545 U.S. 374, 380–81, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

73. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

74. *Id.* at 689, 104 S.Ct. 2052.

75. *Id.*

trial on two alternative grounds, both of which he has also raised before us: (1) that the State prevented Hales's trial attorneys from subjecting the CT scans to pretrial review by a qualified expert and that the new expert's testimony thus provides "new evidence" upon which we should grant a new trial or (2) that his counsel provided ineffective assistance. Because we find ineffective assistance of counsel, we do not reach Hales's new evidence claim. We note his "new evidence" argument, however, because some explanation is warranted regarding Hales's claim that his trial attorneys were improperly denied pretrial access to the CT scans by prosecutors.

¶ 72 Hales has placed facts in the record showing that after the preliminary hearing, where the State relied heavily on evidence from the CT scans, one of Hales's trial attorneys asked one of the prosecutors for copies of the CT scans. The prosecutor replied that copies could not be made for review. Although Hales has argued that because of this he was improperly denied access to the CT scans, the district court found that "the decision [by the defense] not to seek review of the scans appears to be tactical." "[W]hile Defendant may not have reviewed the scans, and Plaintiff may have stated that *copies* of such were not available, there is no evidence Defendant was denied access to the *original* CT scans."

¶ 73 Because the district court found that Hales's trial attorneys' decision not to seek review of the CT scans was tactical and then rejected Hales's ineffective assistance of counsel claim without further analysis, it likely concluded that Hales's trial attorneys' tactical decision not to review the original CT scans fell within the broad range of reasonable professional assistance. We accept the trial court's factual finding that the decision was "tactical," but we disagree to the extent that the district court concluded that this tactical decision was reasonable.

¶ 74 The State's presentation of its case at the preliminary hearing put Hales's trial attorneys on notice that the State's interpretation of the CT scans depicting Luther's brain injuries was critical to the State's case against Hales. Because the State had no witness to the cause of Luther's injuries, the medical evidence in the case, and in particular the CT scans, was the primary source of information regarding what happened to Luther. In fact, the State itself stated in its closing argument that Dr. Walker's testimony regarding the CT scans was "critical" to determining what happened to Luther while he was in Hales's care on the night of December 5, 1985.

¶ 75 At the preliminary hearing, Dr. Walker testified to the following findings: the first CT scan, which was taken on December 5, 1985, showed initial signs of edema and bleeding over the surface and between the hemispheres of the brain (or "subarachnoid hemorrhaging"); the CT scans taken on December 8, 1985, and December 11, 1985, showed "black brain," evidencing global injury caused by something like lack of blood flow and oxygen (or "hypoxia-ischemia"), which injured the brain throughout; the CT scan from December 8, 1985, showed that the degree of injury to the front and the back of the brain differed, indicating that arteries had been occluded by swelling; and finally, a CT scan taken three years later, on December 13, 1988, showed a shrunken brain evidencing severe loss of functions.

¶ 76 Combining these findings and his general observations about the appearance of the brain in the CT scans, Dr. Walker made crucial assertions regarding the cause, timing, and violence of the injury. He testified that the injury he observed from the CT scans would have rendered Luther immediately unconscious and that, therefore, there could have been no lucid interval between the injury and the onset of the severe symptoms. Specifically, he opined that "the degree of injury we see on these scans tells us that this child's brain was severely injured and at the point of injury this child was unconscious, was deeply brain injured," and that the shrunken brain shown in the last CT scan "is simply a reflection of the amount of injury that occurred on the 5th of December." Furthermore, Dr. Walker opined that the global nature of the brain injury indicated that the injury was not caused by an impact, and that the force required to cause the

injuries to a baby's brain shown on the CT scans from shaking would be "violent force."

¶ 77 Based on the CT scans and the other medical evidence regarding retinal hemorrhaging, Dr. Walker concluded that the injury to Luther must have been nonaccidental and caused by shaken baby syndrome. Dr. Walker explained that the "constellation of injuries" clinically associated with shaken baby syndrome is indicated by

a brain scan that actually looks quite similar to what we've seen here today. It's a dark brain, suggesting that there is early injury that's massive and on both sides. There frequently is evidence of bleeding over the surface of the brain called subarachnoid hemorrhage. Oftentimes, there is another layer of bleeding called subdural hemorrhage. There is the finding of hemorrhage into the eyebrows we call retinal hemorrhaging. And then occasionally we find other evidence of abuse in these children, they have a higher incidence of having other forms of abuse. For example, a skeletal survey might show evidence of other fractures that are old.

Dr. Walker testified that all of these markers were present except for the subdural hemorrhaging and evidence of past abuse.

¶ 78 Despite the centrality of the CT scans of Luther's brain to the State's case, Hales's trial attorneys did not have a radiologist or other qualified expert review Luther's CT scans as part of their pretrial investigation. Instead, they decided to rely solely on cross-examination of Dr. Walker and the testimony of an expert forensic pathologist, Dr. Plunkett, whose primary theory was that shaking can damage an infant's neck, but cannot produce brain injury, and that, therefore, the most reasonable explanation for the injury was the near-miss car accident described by Hales that occurred two days before Luther was hospitalized. Hales's trial attorneys had apparently hoped that Dr. Plunkett would be able to testify regarding injuries depicted in the CT scans, but they waited to show those scans to Dr. Plunkett until the morning of trial, and they failed to verify that Dr. Plunkett would be qualified to testify regarding the

CT scans. In fact, the district court prohibited Dr. Plunkett from offering testimony interpreting the CT scans because he admitted on voir dire that he did not read CT scans in his work.

¶ 79 We are convinced that the testimony at the preliminary hearing would have indicated to an attorney providing reasonable professional assistance that the evidence contained in the CT scans was critical to the case and that Hales would suffer a significant disadvantage at trial if he were unable to use the CT scans to illustrate how the injuries would fit into his theory of the case. Further, because the findings from the CT scans were crucial to establish the cause, timing, and violence of Luther's injuries, we are convinced that an attorney providing reasonable professional assistance would have sought another opinion from a qualified expert regarding what could and could not be seen in the CT scans. This is particularly so where, as here, the defense's theory that the injuries were caused by the near-miss car accident depended upon convincing the jury that the brain injury shown in the CT scans could have been caused by an impact injury and would not have caused immediate unconsciousness as Dr. Walker had testified.

¶ 80 We have previously held that an attorney may often provide adequate assistance without hiring an expert to do a separate examination of the evidence. For instance, in *Taylor v. Warden*,[76] we found that a reasonable investigation did not necessarily require the defense to hire an expert to testify regarding a fingerprint match because the defendant's counsel acknowledged the strength of the State's expert's testimony that thirty-two points of positive comparison and matching prints from adjacent fingers "eliminat[ed] any possibility of a misidentification."[77] However, this case differs significantly from *Taylor*. Here, the defense's theory required the jury to disbelieve Dr. Walker's interpretation of the CT scans, including the cause, timing, and violence of the injury. Further, although we have indicated

---

**76.** 905 P.2d 277 (Utah 1995).

**77.** *Id.* at 284.

that in many circumstances defense attorneys may reasonably decide to rebut an expert's testimony without hiring a competing expert, the centrality of this medical evidence to the jury's determination of Hales's guilt or innocence made an expert necessary in this case.

¶ 81 Nevertheless, the State urges us to conclude that Hales's trial attorneys provided adequate assistance because he had three experienced attorneys from the legal defenders office who did hire an expert who supported their theory of the case. The State asserts that once the defense finds one expert to support their position, it is not necessary to search for another.

¶ 82 We note, however, that this is not a case where the defense already subjected the CT scans to review by one qualified expert. Dr. Plunkett was a forensic pathologist who did not interpret CT scans in his practice, not a radiologist. Regardless of the strength of the theory supported by Dr. Plunkett, the existence of that theory cannot excuse the failure to hire an expert to interpret the CT scans. The defense prematurely rejected the possibility that the CT scans might contain evidence that would contradict Dr. Walker's interpretation of the scans and cast doubt upon the cause, timing, or violence of the injury. Moreover, because of the central role that interpretation of the CT scans played in the case, it should have been evident to an attorney rendering reasonable professional assistance that the defense would be under a distinct disadvantage if it were not allowed to use the CT scans to support his theory of defense at trial. It is unlikely that acquisition of another expert opinion would have harmed the defense's theory. And the opportunity to acquire another expert opinion presented a significant opportunity to discover crucial new information about what happened to Luther. Accordingly, viewed from the perspective of the pretrial investigation, the defense's decision to limit the investigation this way was not a reasonable professional judgment.

¶ 83 This is not to say that the defense could not have made a reasonable professional judgment to rely on Dr. Plunkett and his theory of the case, but only that the defense could not reasonably have made this decision without first conducting a full investigation of the merits of the case. In other words, Hales's trial attorneys "were not in a position to make a reasonable strategic choice" as to whether to rely solely on the theory posited by Dr. Plunkett "because the investigation supporting their choice was unreasonable."[78]

### B. Hales's Trial Attorneys' Failure to Investigate the CT Scans was Prejudicial

¶ 84 Hales argues that he was prejudiced by his trial attorneys' failure to hire a qualified expert to examine the CT scans for the defense because the initial CT scan taken between 8:41 p.m. and 8:45 p.m. on December 5, 1985, shows changes in gray/white differentiation that usually do not show up on a scan until approximately 6 to 12 hours after the injury occurred-meaning that the scans provide evidence that Luther was not in Hales's care when he was injured. Hales supported these assertions in his motion for a new trial before the district court with an affidavit from Dr. Barnes, a pediatric neuro-radiologist.

¶ 85 In addressing this issue, we initially note that the State suggested at oral argument that if we conclude that Hales's trial attorneys' investigation was unreasonable, we should remand for an evidentiary hearing regarding whether that decision was prejudicial. Although the State has admitted that Dr. Barnes would be qualified as an expert, it indicated that because Dr. Barnes's testimony has not been "tested," it would like the opportunity to challenge Dr. Barnes's medical opinions with other medical opinions and texts and thus to establish that his testimony would likely not affect the outcome of the trial. Because the record before us is adequate, and because the State previously has repeatedly represented that an evidentiary hearing on this specific issue is unnecessary,[79] we decline to remand for an evidentiary hearing.

---

78. *Wiggins v. Smith,* 539 U.S. 510, 536, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

79. The State represented both at oral argument before the district court on Hales's motion for a

¶ 86 Under *Strickland,* even when counsel's performance is inadequate, a defendant who has been convicted of a crime is not entitled to a new trial unless the defendant establishes that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." [80] "A reasonable probability is a probability sufficient to undermine confidence in the [jury verdict]." [81] Because "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated trivial effect," in determining the effect of the error, we "consider the totality of the evidence before the . . . jury." [82]

¶ 87 In support of his claim of prejudice, Hales points to the affidavit from pediatric neuroradiologist Dr. Barnes in which Dr. Barnes concludes that the CT scan of Luther's brain taken between 8:41 p.m. and 8:45 p.m. on December 5, 1985, shows a change in cell structure observable as changes in gray/white differentiation that takes time to develop. According to Dr. Barnes, "[a]lthough there is some variability, edema and changes in gray/white differentiation will not appear in a CT scan until at least 6 to 12 hours after the initiating insult." If believed by a jury, this testimony would establish that the injury to Luther most likely happened prior to the 20 to 30 minute period on the night of December 5 when he was in Hales's care and may have happened while he was in Westerman's care. According to the records, Luther was admitted to Cottonwood Hospital's emergency room at 7:34 p.m., and police reports indicate that the incident occurred at 7:03 p.m. Hales was with Luther for just 20 to 30 minutes. If the injury did indeed occur six hours prior to Luther's admission, that would place the injury sometime around 2:45 p.m.

¶ 88 Hales argues in his brief that had the defense retained any qualified radiologist to interpret the CT scans, that expert would likely have discovered the significance of the changes in gray/white differentiation in Luther's original CT scan and would have interpreted it properly. Dr. Barnes characterizes his opinions as consistent with the current medical literature. The State does not contest that an alternative opinion in line with Dr. Barnes's interpretation of the CT scans could have been easily obtained. In fact, the State noted in its argument on a separate point of appeal that Dr. Barnes's testimony did not meet the standard for new evidence because Dr. Barnes was a prominent physician in his field whom the defense could have discovered with a "30–second" search on "Google."

¶ 89 If introduced at trial, Dr. Barnes's testimony or similar testimony from a different expert regarding the gray/white differentiation and timing of edema would likely alter the defense's theory at trial as well as the entire evidentiary picture presented to the jury. In Hales's trial, the jury was presented with no basis in the CT scans for believing that Luther's injury happened prior to the time when Hales cared for him on the night

new trial and in its own rule 23B motion to remand for an evidentiary hearing on a different ineffective assistance of counsel claim that an evidentiary hearing upon this specific issue was unnecessary. At oral argument on Hales's motion for a new trial, the State responded to Hales's arguments that Dr. Barnes's testimony was undisputed by stating as follows:

So what we really have here is a doctor who is giving a different view of evidence. We have not opposed it at this stage because this is a motion for a new trial; it is not the new trial. There would be different opinions and different evidence if Dr. Barnes were to testify.

In connection with its rule 23B motion, the State responded as follows to Hales's argument that the court should remand for an evidentiary hearing on additional claims:

The State has no objection to remanding for [an evidentiary hearing on] other ineffectiveness claims so long as defendant shows that a remand is necessary and warranted under rule 23B. He has not done so here. Indeed, an evidentiary hearing would not be warranted on most of his claims because they are based on legal questions and accurate record facts. They can thus be determined without a remand.

In a footnote, the State listed only one exception where remand would be helpful, and that exception did not include this issue.

80. *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052.

81. *Id.* at 694, 104 S.Ct. 2052.

82. *Id.* at 695–96, 104 S.Ct. 2052.

of December 5. In fact, the only witness at trial who was qualified to explain the injuries in Luther's CT scans to the jury and to anchor his opinions regarding the cause and timing of the injury in the overall picture presented by those scans was the State's expert, Dr. Walker. Dr. Walker testified that the brain injury shown in the CT scans was so severe that it would have caused immediate unconsciousness. In closing arguments, the State focused on this testimony, arguing that because Hales testified that he responded to noises made by Luther, Luther must have been conscious when Westerman left for the grocery store. Thus, according to the State, Dr. Walker's testimony established that the injury must have occurred while Luther was in Hales's care on the night of December 5, 1985, and was not accidental.

¶ 90 Instead of directly challenging Dr. Walker's conclusions by pointing to evidence contained in the CT scans, the defense called a forensic pathologist, Dr. Plunkett, to testify that shaking an infant could not cause brain damage (only damage to the neck) and that, therefore, the most likely cause of Luther's brain injury was the near-miss car accident two days prior, followed by an unusually lengthy "lucid interval." Hales's trial attorneys also attempted to undermine Dr. Walker's conclusions from the CT scans by asking general questions about CT scan interpretation on cross-examination.

¶ 91 In comparison, if the defense had presented testimony from Dr. Barnes or a similar expert regarding the timing of the gray/white differentiation and developing edema, the jury would have been presented with a competing interpretation of the CT scan evidence that would have required it to weigh Dr. Walker's interpretation against the interpretation provided by another qualified expert. This would have undermined the State's ability to use the CT scans to conclusively pin responsibility for Luther's injuries on Hales. This competing interpretation would have likely cast doubt on the State's ability to rule out theories that the injury may have been accidental or caused earlier in the day by Westerman. Additionally, it is relevant that Dr. Barnes's affidavit further indicates that other crucial portions of Dr.

Walker's testimony are susceptible to attack by an expert who is qualified to read the CT scans. For instance, Dr. Barnes opines that "there is nothing in these scans which would suggest that the injury was from a shaking as opposed to [an] impact injury or other possible causes," including nonaccidental causes. And he disputes Dr. Walker's conclusion that the global nature and degree of the brain injuries shown in the later CT scan images reflects an injury that would have caused immediate unconsciousness:

> Dr. Walker's opinions are not in any sense based upon or supported by the actual CT scans of Luther Deem. There is nothing in these scans which indicates what caused the injury or how fast the onset of symptoms would occur. There is nothing in these scans that is inconsistent with a period of consciousness [lucid interval] after the injury occurred. There is nothing in regards to the global nature of the injury which is indicative of cause or rapidity of the onset of symptoms. The scan shows the point to which the injury had progressed-not how it got there. Beyond that, his conclusions are unsupported by current medical literature and study.

Dr. Barnes also asserts that "[g]lobal brain injury is almost always the product of hypoxia-ischemia" and "does not necessarily correlate to the severity or violence of the original insult." "In fact it may not be the product of traumatic injury."

¶ 92 Because the State's murder case against Hales hinged on the interpretation of the CT scans to show a nonaccidental injury caused while Luther was in Hales's care on the night of December 5, 1985, we think that the jury could have been swayed by a medical expert able to interpret the CT scans and challenge Dr. Walker's critical findings regarding the timing, cause, and violence of the injuries. Given the centrality of Dr. Walker's interpretation of the CT scans, we are convinced that there is a reasonable probability that, had Hales's trial attorneys investigated the CT scans, they could have presented an alternative interpretation of the CT scans sufficient to raise a reasonable doubt as to Hales's guilt. In finding that there was a "reasonable probability" that, but for the

errors, Hales would not have been convicted, we do not need to find that the jury would have more likely than not believed another expert's interpretation over Dr. Walker's. A reasonable probability is a probability sufficient to undermine our confidence in the outcome.[83] That standard is met on the facts of this case because Hales's trial attorneys' failure to investigate had a "pervasive effect" on the key evidence at trial.

## CONCLUSION

¶ 93 Hales's right to due process under the United States Constitution was not violated by his prosecution after the delay and loss of evidence in this case. And there was sufficient evidence from which the jury could reasonably have concluded that Hales acted with the state of mind necessary to convict him of murder. Therefore, we decline to vacate his conviction. Nevertheless, we hold that Hales's trial attorneys failed to provide effective assistance of counsel because they did not hire a qualified expert to give an independent interpretation of the CT scans of Luther's brain injuries. Hales's trial attorneys thus failed to conduct an adequate investigation regarding the CT scans that were crucial to the State's case against Ha-

les. Hales was prejudiced by this failure because, had his trial attorneys sought out an expert analysis of the CT scans, there was a reasonable probability that they would have obtained and the jury would have credited expert testimony questioning the crucial evidence regarding the timing, nature, and violence of the injury. In sum, we hold that Hales's trial attorneys provided ineffective assistance, thereby "undermin[ing] the proper functioning of the adversarial process."[84] Because the trial "cannot be relied on as having produced a just result,"[85] we remand for a new trial without reaching the remaining claims of error associated with Hales's initial trial.

¶ 94 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT'S opinion.

**83.** *Id.* at 694, 104 S.Ct. 2052.

**84.** *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**85.** *Id.*