**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 47793**

| | |
|---|---|
| JEFFERY ALAN BAKER, | ) |
| | ) **Filed: June 30, 2021** |
| Petitioner-Appellant, | ) |
| | ) **Melanie Gagnepain, Clerk** |
| v. | ) |
| | ) |
| STATE OF IDAHO, | ) |
| | ) |
| Respondent. | ) |
| | ) |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Peter G. Barton, District Judge.

Judgment summarily dismissing petition for post-conviction relief, <u>affirmed in part</u>, <u>reversed in part</u>, and <u>case remanded</u>.

Ferguson Durham PLLC; Craig H. Durham, Boise, for appellant. Craig H. Durham argued.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

_____

BRAILSFORD, Judge

Jeffery Alan Baker appeals from the summary dismissal of his petition for post-conviction relief. Specifically, Baker appeals the dismissal of a *Brady*[1] claim, two claims of ineffective assistance of counsel for failing to present expert testimony, a claim of ineffective assistance of counsel for failing to object to prosecutorial misconduct during closing argument, and a claim of actual innocence. We affirm the district court's summary dismissal of Baker's actual innocence claim and his claims of ineffective assistance of counsel. We reverse, however, the court's summary dismissal of Baker's *Brady* claim and remand this case for an evidentiary hearing.

---

[1]     *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding prosecution's suppression of material evidence violates due process).

1

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

A jury convicted Baker of first degree murder of his eleven-week-old daughter, G.B. Baker's girlfriend gave birth to G.B. in February 2010. When G.B. was born, she tested positive for drugs, and the Department of Health and Welfare took custody of her. The Department allowed Baker to have custody of G.B. during the week, while her mother had custodial visitation on the weekends. Because Baker worked during the weekdays, he hired his former girlfriend to care for G.B. during the day.

During the weekend of May 8, G.B.'s mother had custodial visitation, and Baker picked G.B. up Sunday evening. On Monday morning, May 10, Baker dropped G.B. off at the babysitter's home before work. The babysitter testified G.B. was spitting up, vomiting, and crying more than usual that day. The babysitter called Baker and told him about G.B.'s crying, and Baker left work early to pick up G.B. and then took her home.

On the way home, Baker spoke to his neighbors and told them G.B had been fussing and crying, but the neighbor testified G.B. appeared normal and was not fussing or crying. Later, while in Baker's care at home, G.B. stopped breathing. Baker alerted his neighbors who called 911. The first responders resurrected G.B. and transported her to the hospital. She died several days later, however, after she was removed from life support.

As a result of G.B.'s death, the State charged Baker with first degree murder, alleging Baker killed G.B. by shaking her or causing blunt force trauma to her head. Baker pled not guilty and proceeded to trial in January 2012. The trial ended in a mistrial, however, and the district court scheduled a second trial for April 2013.

In preparation for the second trial, the State disclosed for the first time in August 2012 that it intended to present Brian Keim's testimony at trial. Keim was an inmate incarcerated with Baker in 2011 at the Idaho State Correctional Institution (ISCI). In June 2011, Keim contacted Detective Oster, a Boise City Police Officer who had investigated G.B.'s death, and informed Detective Oster that Baker had confessed to killing G.B. Detective Oster and the prosecutor met with Keim in July 2011. As a result of the prosecution's disclosure of Keim as a witness, Baker's public defenders notified the district court that they represented Keim in 2011 and had a conflict of interest. Thereafter, a private attorney (hereafter "trial counsel") substituted for the

public defender's office to represent Baker. The same day trial counsel appeared on Baker's behalf, he served a request on the State for the disclosure of exculpatory *Brady* material.

## A.     Brian Keim's Testimony

The second trial occurred in April 2013 and lasted eight days. The State called twenty-one witnesses, including Keim who was the State's first witness. Keim testified that Baker confessed to killing G.B. and described how Baker claimed her death occurred. On direct examination, Keim testified that, while incarcerated with Baker in June 2011, Baker offered Keim $10,000 to advise Baker on his defense; Keim reviewed a copy of the police report regarding G.B.'s death at Baker's request; and at Keim's prompting, Baker told him "what really happened" and confessed to causing G.B.'s death. According to Keim, Baker told him that G.B. was "screeching and crying" at "supersonic levels"; "the baby wouldn't stop crying and he just kind of snapped, freaked out"; and "he said he blacked out and he kind of marched into the bedroom and grabbed the baby and just slammed her on the bed really hard and said, 'Shut the f--k up.'"

Keim then demonstrated for the jury how Baker was "slamming [G.B.] on the bed." Keim further testified, Baker left the room and returned to find G.B. "unconscious and slumped over"; Baker "panicked" and tried "to make it look like an accident by choking on formula"; and he "forced formula into her mouth and her nose." Keim also testified that Baker confessed he had previously shaken the baby on other occasions before May 10.

Keim further testified that, after Baker's confession, Keim "was feeling pretty outraged, not just for the fact [Baker] was saying this, but he didn't really care" and "[h]is only concern was . . . to get out of this." Regardless, Keim proceeded to advise Baker on his defense, testifying: "I wrote down a full page of what I think his best approach was [for a defense], you know his only hope as far as I was concerned." Then, Keim contacted the police, specifically Detective Oster, who Keim knew had investigated G.B.'s death. Keim then met with Detective Oster and the prosecutor in July 2011 and again in August 2012. Keim testified that the State did not give him anything in exchange for his testimony.

On cross-examination, Baker's counsel attempted to impeach Keim with inconsistent statements he made during his interviews with Detective Oster and the prosecutor, including Keim's description of G.B.'s crying as "supersonic"; of Baker slamming versus bouncing G.B. on the bed; of Baker "blacking out"; and of Baker squirting, blowing, or forcing formula down

3

G.B.'s throat. Further, during cross-examination, Keim acknowledged he asked Detective Oster for help with an upcoming parole hearing but testified that "they never helped me." He also acknowledged, however, that he was transferred from ISCI, a medium security facility, to St. Anthony Work Camp (SAWC), a minimum security facility, but claimed that "they didn't have anything to do with that."

On re-direct, Keim testified that the day after meeting with the prosecutor in July 2011, he requested to be placed in protective custody because he was concerned about other inmates "calling [him] a rat" and getting into confrontations "over it." The prosecutor inquired whether Keim's transfer to SAWC "was due to you wanting protection or because we gave you something." Keim responded, "Well, it was mainly the protection part, okay? But, I mean, I was also--I was going to be minimum security anyway." Explaining why he contacted Detective Oster about Baker's confession, Keim testified he felt badly for the mother and "didn't want an innocent person's name getting drug through the mud" because he had advised Keim "to make it look like somebody else did it."

While Keim was the State's first witness at trial, its last witness was the ISCI "facility move coordinator." The coordinator testified that she was responsible for tracking information about inmates' transfers in and out of ISCI; this information was recorded in a computer system; and altering or changing the information once entered in the computer was not possible. Further, the coordinator testified about how an inmate qualified for a transfer to a different facility under a "matrix" point system. According to the coordinator, under this matrix system an inmate with lower points may qualify for housing in a lower level security facility, like SAWC. The coordinator also testified that she looked at Keim's placement records; they showed Keim transferred to SAWC sometime after July 2011; and no detective or law enforcement officer, including the prosecutor, talked to her about moving Keim from ISCI to SAWC. Finally, the coordinator testified that she could not recall why Keim was transferred to SAWC but that the only way Keim would have qualified for such a transfer was if he qualified under the matrix system for minimum security.

## B.    Medical Testimony

In between Keim's testimony and the testimony of the ISCI facility move coordinator, the State also presented numerous other witnesses, including witnesses who testified about the medical issues in the case. This medical testimony included testimony from a treating pediatric

4

critical care specialist; a treating pediatric ophthalmologist; the radiologist who read the chest X-rays, MRI, and CT scans (imaging) of G.B. after her admission to the hospital; a consulting pediatrician; a forensic pathologist who performed the autopsy; an ophthalmologist with a specialty in ophthalmic pathology; and a retained expert neuropathologist. The State's medical testimony was conflicting. For this reason, the State's theory was Baker had caused G.B.'s death either by blunt force trauma or, alternatively, by shaking.

The forensic pathologist who performed the autopsy, Dr. Garrison, testified that he did not find any external signs of injury, except a bruise on the right side of the head, which no one had previously noticed and which he acknowledged the medical care providers may have possibly caused. Dr. Garrison also did not find any injuries to the spinal canal, the neck, or any broken bones. Dr. Garrison did note, however, cerebral venous thrombosis (CVT), a blood clot in one or more of the cerebral veins in the brain. Specifically, he found several dilated vessels in the brain "appeared to be clotted." Although he included this finding in a letter to a consulting pathologist, he did not include the finding in his final autopsy report. Further, Dr. Garrison noted an old subdural hematoma, a small new subdural hematoma, a subarachnoid hemorrhage, bilateral retinal hemorrhages, and ischemic encephalopathy (brain changes due to lack of blood and oxygen). Based on these findings, Dr. Garrison concluded G.B.'s cause of death was "abusive head injury" and listed "blunt force trauma to the head" as the manner of death.

Dr. Rorke-Adams, the State's expert neuropathologist, disagreed with Dr. Garrison's conclusion that blunt force trauma caused G.B.'s death. Dr. Rorke-Adams testified that G.B. was shaken, which led to a loss of consciousness, and then she was propped up in a sitting position, was unable to hold her head up, and slumped forward cutting off her air intake causing her death by a hypoxic-ischemic injury (lack of blood and oxygen to the brain). Regarding the CVT which Dr. Garrison found during the autopsy, Dr. Rorke-Adams testified this condition was due to "blood sludging" (or slowing) occurring after G.B. was admitted to the hospital and while she was on life support. Also, Dr. Ririe, the radiologist who reviewed the imaging taken of G.B. at the hospital, testified about CVT. His testified that it was not possible to determine from the imaging whether CVT already existed when G.B. was admitted to the hospital.

In contrast, Baker's theory of the case was that CVT pre-existed G.B.'s admission to the hospital and that as a result of that condition, "G.B. suffered something like a stroke, stopped breathing, and suffered hypoxic brain damage." To counter the State's medical evidence, Baker

5

presented the testimony of a forensic pathologist, Dr. Plunkett, and a neuropathologist, Dr. Hua. Dr. Plunkett testified G.B.'s death was caused by CVT. Similarly, Dr. Hua saw evidence of CVT, although he did not reach the ultimate conclusion that the condition caused G.B.'s death. Both Dr. Plunkett and Dr. Hua agreed that the medical findings did not support death by blunt force trauma or shaking and that no exterior signs of child abuse such as bruising (other than the bruise found during the autopsy) existed. They also testified that "lines of Zahn," which are "specific microscopic blood markers," were present, indicating G.B. was alive when the blood clots first formed in her brain.

During closing argument, the prosecutor stated: "You have two major pieces or groups of evidence, the testimony of Brian Keim of what [Baker] said he did, and then all of the medical evidence." Regarding Keim's testimony, the prosecutor repeatedly argued that "you have no evidence that he's ever falsely testified before"; "he's never given false testimony"; and he never received "anything from us in exchange for [his] testimony." Further, the prosecutor argued during closing argument that "Keim's testimony is corroborated by all the medical evidence" and explained this corroboration.

## C. Post-Conviction Allegations

The jury convicted Baker of first degree murder. Baker appealed his conviction and sentence, and this Court affirmed in *State v. Baker*, 161 Idaho 289, 385 P.3d 467 (Ct. App. 2016).[2] Thereafter, Baker filed a petition for post-conviction relief. As it relates to this appeal, Baker alleged claims of ineffective assistance of counsel for failing to present the testimony of a neuroradiologist and of a pediatric neurologist and for failing to object to prosecutorial misconduct during closing argument, a *Brady* claim, and a claim of actual innocence.

The State answered Baker's petition and moved for summary dismissal of all his claims. Thereafter, however, the State moved to amend its answer. The purpose of the State's motion was to disclose "5 CDs of calls made by Brian Keim recorded at the prison in 2011-2012." The motion to amend acknowledged that the State was in possession of the CDs prior to trial; the

---

[2]    The State notes in its appellate brief that this Court did not mention Keim's testimony when affirming Baker's direct appeal. Baker, however, did not raise any direct appellate challenges implicating Keim's testimony. As a result, this Court had no reason to address Keim's testimony on direct appeal, and its decision in *State v. Baker*, 161 Idaho 289, 385 P.3d 467 (Ct. App. 2016), should not be read as reaching any conclusion about the impact of Keim's testimony on the verdict.

6

CDs were contained in an envelope with "a notation . . . questioning whether the [CDs] had already been disclosed to the defense"; the State never produced the CDs to Baker; but the CDs did "not contain any exculpatory information." The district court granted the State's motion to amend.[3]

Based on this newly disclosed evidence and the other information which Baker had submitted in support of his petition, Baker moved for partial summary disposition, arguing he had conclusively established a meritorious *Brady* claim. Alternatively, Baker filed an amended response to the State's summary dismissal motion, arguing he had at least presented sufficient evidence to warrant an evidentiary hearing, including on the *Brady* claim. Following a hearing on both motions, the district court issued a written order summarily dismissing all of Baker's claims. Baker timely appeals.

## II.

## STANDARD OF REVIEW

A petition for post-conviction relief initiates a proceeding that is civil in nature. Idaho Code § 19-4907; *Rhoades v. State*, 148 Idaho 247, 249, 220 P.3d 1066, 1068 (2009); *State v. Bearshield*, 104 Idaho 676, 678, 662 P.2d 548, 550 (1983); *Murray v. State*, 121 Idaho 918, 921, 828 P.2d 1323, 1326 (Ct. App. 1992). Like a plaintiff in a civil action, the petitioner must prove by a preponderance of evidence the allegations upon which the request for post-conviction relief is based. *Goodwin v. State*, 138 Idaho 269, 271, 61 P.3d 626, 628 (Ct. App. 2002). A petition for post-conviction relief differs from a complaint in an ordinary civil action. *Dunlap v. State*, 141 Idaho 50, 56, 106 P.3d 376, 382 (2004). A petition must contain much more than a short and plain statement of the claim that would suffice for a complaint under I.R.C.P. 8(a)(1). Rather, a petition for post-conviction relief must be verified with respect to facts within the personal knowledge of the petitioner, and affidavits, records, or other evidence supporting its allegations must be attached or the petition must state why such supporting evidence is not included with the petition. I.C. § 19-4903. In other words, the petition must present or be accompanied by admissible evidence supporting its allegations, or the petition will be subject to dismissal. *Wolf v. State*, 152 Idaho 64, 67, 266 P.3d 1169, 1172 (Ct. App. 2011).

---

[3]     Despite the fact that the district court granted the State's motion to amend its answer, the appellate record does not contain an amended answer.

Idaho Code Section 19-4906 authorizes summary dismissal of a petition for post-conviction relief, either pursuant to a motion by a party or upon the court's own initiative, if it appears from the pleadings, depositions, answers to interrogatories, and admissions and agreements of fact, together with any affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. When considering summary dismissal, the district court must construe disputed facts in the petitioner's favor, but the court is not required to accept either the petitioner's mere conclusory allegations, unsupported by admissible evidence, or the petitioner's conclusions of law. *Roman v. State*, 125 Idaho 644, 647, 873 P.2d 898, 901 (Ct. App. 1994); *Baruth v. Gardner*, 110 Idaho 156, 159, 715 P.2d 369, 372 (Ct. App. 1986). Moreover, the district court, as the trier of fact, is not constrained to draw inferences in favor of the party opposing the motion for summary disposition; rather, the district court is free to arrive at the most probable inferences to be drawn from uncontroverted evidence. *Hayes v. State*, 146 Idaho 353, 355, 195 P.3d 712, 714 (Ct. App. 2008). Such inferences will not be disturbed on appeal if the uncontroverted evidence is sufficient to justify them. *Id.*

Claims may be summarily dismissed if the petitioner's allegations are clearly disproven by the record of the criminal proceedings, if the petitioner has not presented evidence making a prima facie case as to each essential element of the claims, or if the petitioner's allegations do not justify relief as a matter of law. *Kelly v. State*, 149 Idaho 517, 521, 236 P.3d 1277, 1281 (2010); *DeRushé v. State*, 146 Idaho 599, 603, 200 P.3d 1148, 1152 (2009). Thus, summary dismissal of a claim for post-conviction relief is appropriate when the court can conclude, as a matter of law, that the petitioner is not entitled to relief even with all disputed facts construed in the petitioner's favor. For this reason, summary dismissal of a post-conviction petition may be appropriate even when the State does not controvert the petitioner's evidence. *See Roman*, 125 Idaho at 647, 873 P.2d at 901.

Conversely, if the petition, affidavits, and other evidence supporting the petition allege facts that, if true, would entitle the petitioner to relief, the post-conviction claim may not be summarily dismissed. *Charboneau v. State*, 140 Idaho 789, 792, 102 P.3d 1108, 1111 (2004); *Sheahan v. State*, 146 Idaho 101, 104, 190 P.3d 920, 923 (Ct. App. 2008). If a genuine issue of material fact is presented, an evidentiary hearing must be conducted to resolve the factual issues. *Goodwin*, 138 Idaho at 272, 61 P.3d at 629.

On appeal from an order of summary dismissal, we apply the same standards utilized by the trial courts and examine whether the petitioner's admissible evidence asserts facts which, if true, would entitle the petitioner to relief. *Ridgley v. State*, 148 Idaho 671, 675, 227 P.3d 925, 929 (2010); *Sheahan*, 146 Idaho at 104, 190 P.3d at 923. Over questions of law, we exercise free review. *Rhoades*, 148 Idaho at 250, 220 P.3d at 1069; *Downing v. State*, 136 Idaho 367, 370, 33 P.3d 841, 844 (Ct. App. 2001).

## III.

## ANALYSIS

### A.      Ineffective Assistance of Counsel Claims

Baker asserts his trial counsel was ineffective for failing to present the testimony of Dr. Barnes, a neuroradiologist; for failing to present the testimony of a pediatric neurologist like Dr. Scheller; and for failing to object to prosecutorial misconduct during closing argument. A claim of ineffective assistance of counsel may properly be brought under the Uniform Post-Conviction Procedure Act. *Barcella v. State*, 148 Idaho 469, 477, 224 P.3d 536, 544 (Ct. App. 2009). To prevail on an ineffective assistance of counsel claim, the petitioner must show that the attorney's performance was deficient and that the petitioner was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Self v. State*, 145 Idaho 578, 580, 181 P.3d 504, 506 (Ct. App. 2007). To establish a deficiency, the petitioner has the burden of showing that the attorney's representation fell below an objective standard of reasonableness. *Aragon v. State*, 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988); *Knutsen v. State*, 144 Idaho 433, 442, 163 P.3d 222, 231 (Ct. App. 2007). To establish prejudice, the petitioner must show a reasonable probability that, but for the attorney's deficient performance, the outcome of the trial would have been different. *Aragon*, 114 Idaho at 761, 760 P.2d at 1177; *Knutsen*, 144 Idaho at 442, 163 P.3d at 231.

As the United States Supreme Court has explained, trial counsel is presumed to have acted reasonably:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant

9

must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689. Accordingly, this Court presumes that trial counsel was competent and that trial tactics were based on sound legal strategy. *McKay v. State*, 148 Idaho 567, 570, 225 P.3d 700, 703 (2010).

The decision of what witnesses to call is a strategic and tactical decision the Court will not second-guess. *Marsalis v. State*, 166 Idaho 334, 346, 458 P.3d 203, 215 (2020); *State v. Abdullah*, 158 Idaho 386, 500, 348 P.3d 1, 115 (2015). Likewise, trial counsel's decision to present medical evidence is strategic and tactical. *Abdullah*, 158 Idaho at 500, 348 P.3d at 115. Further, the Idaho Supreme Court has ruled that when evaluating an ineffective assistance of counsel claim, the Court does not second-guess strategic and tactical decisions, and such decisions cannot serve as a basis for post-conviction relief unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review. *State v. Payne*, 146 Idaho 548, 561, 199 P.3d 123, 136 (2008); *see Marsalis*, 166 Idaho at 346, 458 P.3d at 215 (same); *Wurdemann v. State*, 161 Idaho 713, 720-21, 390 P.3d 439, 446-47 (2017) (same); *Abdullah*, 158 Idaho at 498-99, 348 P.3d at 113-14 (same).

### 1. Failure to present Dr. Barnes's testimony

Baker contends that his trial counsel should have presented additional expert testimony to support the theory that CVT (blood clotting) caused a stroke or other similar event, which in turn caused G.B.'s death. He argues that an important fact in the case was "when the clots that Dr. Garrison found at the autopsy [formed]"; "a critical issue was . . . whether blood clots found in G.B.'s brain were evidence of a stroke preceding her cardiac arrest [on May 10] or instead had developed after she was hospitalized"; and "[m]issing was a defense expert who could prove that the clots likely existed at the time of the hospital admission." Baker alleges that Dr. Barnes, a neuroradiologist, was the missing witness and that his trial counsel was ineffective for failing to present Dr. Barnes's testimony.

Before Baker's trial counsel assumed Baker's representation, Baker's public defender had retained Dr. Barnes to review the imaging taken of G.B.; Dr. Barnes prepared a report; and the prosecution deposed him. Dr. Barnes's primary opinion in his report was that "there may be older collections [on the top of the brain] that may date back to birth plus some superimposed hemorrhage (re-hemorrhage) or venous thromboses." He reiterated this opinion in his

10

deposition. Based on this evidence, Baker alleged "trial counsel had no reasonable strategic reason for failing to present" Dr. Barnes's testimony, which "provided a critical missing piece to the defense" and "would have tipped the scales to an acquittal."

After the State moved for summary disposition, Baker's post-conviction counsel deposed Baker's trial counsel. Baker's trial counsel testified that he read both Dr. Barnes's report and his deposition and that trial counsel had a telephone conversation with Dr. Barnes. Based on that investigation, trial counsel concluded that Dr. Barnes's testimony "was not going to be able to contribute anything of significance"; his opinions were "conservative"; and "his equivocation . . . was probably going to end up making our case less appealing."

After trial counsel's deposition, Dr. Barnes filed a second declaration in support of Baker's petition. In this declaration, Dr. Barnes attested that he had been "informed" trial counsel testified that he had a telephone conversation with Dr. Barnes; trial counsel claimed Dr. Barnes "did not express a strong opinion" and had "uncertainty" about his opinion; and Dr. Barnes did not recall this telephone call and had no record of it.

The district court rejected Baker's claim that his trial counsel should have presented Dr. Barnes's testimony. The court noted the decision of what evidence to introduce at trial is strategic or tactical, and it concluded Baker had failed to establish Dr. Barnes's testimony "regarding pre-existing blood clots would have aided his defense as to G.B.'s death." In support of this conclusion, the court noted that, like the State's evidence, Dr. Barnes's opinion that the imaging showed pre-existing clots was not determinative of the cause of death and that trial counsel could have reasonably decided Dr. Barnes's testimony "would not be productive," "would have been harmful," "would have diluted the defense's case," or "would have distracted the jury."

On appeal, Baker challenges this ruling, arguing "the district court overlooked the importance of Dr. Barnes's opinion [regarding] the *timing of when the clotting occurred.*" We disagree. Contrary to Baker's assertion, Dr. Barnes's anticipated testimony could not "prove that the clots *likely* existed at the time of the hospital admission." (Emphasis added.) Rather, Dr. Barnes's opinion was that "there *may* be older collections [on the top of the brain] that *may* date back to birth plus some superimposed hemorrhage (re-hemorrhage) or venous thromboses." (Emphasis added.) As a result of numerous concessions Dr. Barnes made during his deposition, this opinion was merely speculative.

11

Specifically, Dr. Barnes conceded in his deposition that the word "may" in this context means "merely possible"; "a possibility" means he is speculating; and the statement is "not an opinion that is given to any probability for medical or scientific certainty." In other words, Dr. Barnes's opinion merely speculated the imaging showed clotting. In this regard, Dr. Barnes's opinion was not, as Baker asserts, "consistent with" Dr. Plunkett's and Dr. Hua's opinions that the imaging did indeed show CVT. Rather, Dr. Barnes was much more equivocal about whether the imaging showed clotting.

Further, contrary to Baker's argument, the district court correctly found Dr. Barnes concluded "the pre-existing blood clots were not determinative of a cause of death." For example, Dr. Barnes stated "the CT and MRI findings are nonspecific as to causative pattern of injury and timing, and a differential diagnosis for infant acute life threatening event . . . is required." In other words, the imaging did not indicate what caused the injury that led to G.B.'s death or when that injury occurred. Similarly, Dr. Barnes listed several other possible causes of death, but he stated that "a complete and thorough medical workup is required [to determine the cause of death] including current and remote past medical history" and that absent a complete medical workup, "the gold standard" for determining the cause of death is "a thorough and complete autopsy." The "medical workup" that Dr. Barnes stated was required, however, was not done, and the autopsy supported the State's theory that G.B. died of blunt force trauma.

Also, Baker's argument that the district court "speculated [trial counsel] may have decided for strategic reasons" not to present Dr. Barnes's testimony is without merit. The court found that trial counsel "reasonably could have decided" Dr. Barnes's testimony would "not be productive" or would be harmful, diluting, or distracting. This finding was not speculative. In fact, trial counsel clearly testified at his deposition that he made the strategic decision not to call Dr. Barnes as a witness:

> When the defense starts calling witnesses, I think you want to be very, very careful that your witness is going to be unequivocal and to the point. . . . [Dr. Barnes] did not have strong testimony, in my view, to present. I didn't see that he added anything. And perhaps his equivocation . . . was probably going to end up making our case less appealing.
> . . . .
> I would have explained [to Baker that] I'm not going to put somebody on the stand to say "It's possible that that's what it is," because then the cross-examination is going to be "Well, if it's possible that it is, then isn't it also possible that it is not." That gets us nowhere.

12

Baker asserts that his trial counsel's "recollection conflicts" with Dr. Barnes's second declaration, and thus this declaration creates a factual issue. This assertion is also without merit. Dr. Barnes's second declaration merely attests he does not remember or have a record of the telephone call about which trial counsel testified. That Dr. Barnes does not remember the phone call, however, is not inconsistent with and does not dispute or call into question the most important fact: Dr. Barnes's opinion was equivocal about whether the imaging showed clotting and what caused the death and, thus, was unhelpful to Baker's defense.

Under the circumstances, Baker's trial counsel's decision not to present Dr. Barnes's testimony was objectively reasonable. The prosecution had already deposed Dr. Barnes before trial counsel represented Baker. As a result, trial counsel could not rehabilitate Dr. Barnes and made the strategic decision not to call him because his opinion was uncertain and unhelpful.

Baker is correct that the district court incorrectly found Dr. Barnes was "a mere neurologist" potentially countering the State's neuropathologist, Dr. Rorke-Adams. Despite this error, the court correctly identified Dr. Barnes as a neuroradiologist at the beginning of its analysis. The genesis of the court's error may have been that Baker referred to Dr. Barnes as a "pediatric neurologist" at least once in his petition. Regardless of this error, Dr. Barnes's opinion that the imaging may show blood clotting but not with "any probability for medical or scientific certainty" was consistent with the opinion of the treating radiologist, Dr. Ririe. Dr. Ririe testified on the State's behalf that he did not believe it was possible to determine with any medical certainty from the imaging whether any blood clotting already existed when G.B. was admitted to the hospital. Accordingly, Dr. Barnes's radiology opinion would not have countered the State's radiology opinion.

Baker's reliance on *State v. Hales*, 152 P.3d 321 (Utah 2007), is misplaced. In that case, Hales was watching Luther, a five-month-old infant, for approximately twenty to thirty minutes. *Id.* at 325. When Luther "began gasping for air" and "his eyes had rolled back in his head," Hales called 911. *Id.* Doctors later "determined that Luther had brain swelling and retinal hemorrhaging and that his injuries were likely nonaccidental and caused by shaken baby syndrome." *Id.* at 326. As a result of his brain injuries, Luther existed in a vegetative state for twelve years until he died of complications from those injuries. *Id.* at 325. Two years after Luther's death, the State charged Hales with murder. *Id.*

13

At trial, "the State's case against Hales was based, in large part, on expert interpretation of CT scans." *Id.* at 328-29. The State presented the testimony of a pediatric neurosurgeon who opined that Luther suffered from "shaken baby syndrome," and the neurosurgeon based his opinion on CT scans and retinal hemorrhaging. *Id.* at 329. In contrast, Hales's theory was that Luther's injuries were caused two days before Hales called 911, when he had a "near-miss car accident" causing him to slam on the brakes and Luther to hit the dash because his baby carrier was not belted into the car. *Id.* at 327. In support of this theory, Hales called Dr. Plunkett, who testified that "shaking can cause neck injury, but not brain injury, and therefore, the most likely cause of the injuries was the impact from the near-miss car accident." *Id.*

Despite being on notice that the State's case centered on the CT scans, "Hales's trial attorneys did not have a radiologist or other qualified expert review Luther's CT scans as part of their pretrial investigation." *Id.* at 340. Instead, "they waited to show those scans to Dr. Plunkett until the morning of trial." *Id.* At that time, Dr. Plunkett admitted "he did not read CT scans in his work," and the trial court prohibited him from testifying about the CT scans. *Id.*

The jury convicted Hales of murder, and he moved for a new trial. *Id.* at 329. In support, Hales submitted Dr. Barnes's affidavit stating that the CT scan "shows a change in cell structure that is specifically observable in what is referred to as changes in gray/white differentiation" and that this "differentiation will not appear in a CT scan until at least 6 to 12 hours after the initiating insult." *Id.* Based on this timing, Dr. Barnes opined Luther's injury most likely happened before he was in Hales's care. *Id.* The trial court denied Hales's motion, and he appealed.

On direct appeal, Hales argued his attorneys rendered ineffective assistance because they failed to investigate the CT scans. *Id.* at 329. The Utah Supreme Court agreed, stating "we are convinced that an attorney providing reasonable professional assistance would have sought another opinion from a qualified expert regarding what could and could not be seen in the CT scans." *Id.* at 340. Further, the Court concluded Hales was prejudiced, stating that if believed by a jury, Dr. Barnes's testimony would establish the injury to Luther most likely happened before the twenty to thirty-minute period when Luther was in Hales's care. *Id.* at 342. Accordingly, the Court remanded for a new trial. *Id.* at 344.

Baker argues *Hales* is on point because, like in *Hales*, his case "hinged on when certain neurological changes occurred"; "counsel did not present the testimony of a radiologist expert";

14

and "any 'strategic' reason not to call Dr. Barnes was unreasonable because the investigation supporting that choice was itself unreasonable." In response, the State argues that unlike *Hales*, "trial counsel *did in fact* consult with a 'radiologist or other qualified expert.' He merely chose not to call the expert or seek out another."

The State is correct; this case is distinguishable from *Hales* in at least two important respects. First, unlike *Hales*, Baker's trial counsel actually consulted with Dr. Barnes pretrial and concluded his opinion would not be helpful. Second, Dr. Barnes's opinion in this case is much more equivocal than Dr. Barnes's more definitive opinion in *Hales*, at least as the Utah Supreme Court stated that opinion. In *Hales*, Dr. Barnes opined "the injury *most likely* occurred prior to the time [Luther] was in Hales's care." *Id.* at 329. In contrast, Dr. Barnes's deposition testimony in this case established he was merely speculating that the CT possibly showed blood clotting and that he could not determine from the CT scan what injury caused G.B.'s death or when it occurred.

Finally, even assuming Baker established his trial counsel's performance was deficient, he fails to establish prejudice, i.e., a reasonable probability the trial's outcome would have been different. *See Aragon*, 114 Idaho at 761, 760 P.2d at 1177 (stating standard for prejudice). The district court implicitly ruled that Baker was not prejudiced by concluding he failed to show Dr. Barnes's testimony "would have aided [Baker's] defense." On appeal, Baker argues the court held him "to a higher standard than the Constitution requires" by requiring him to "prove definitively the jury would not have found him guilty." The court, however, did not indicate such a requirement. Further, Baker argues that this Court "should not have confidence in the outcome when at least two experts could have offered compelling evidence that was not before the jury that tilted heavily in the defense's favor." Dr. Barnes's testimony, however, was neither compelling nor did it "tilt" in Baker's favor. Rather, it was more consistent with Dr. Ririe's testimony that it is not possible to determine from the imaging with any medical certainty whether G.B. had CVT before she was admitted to the hospital. Accordingly, trial counsel's decision not to present Dr. Barnes as a witness did not prejudice Baker, and the district court did not err by dismissing Baker's claim that his trial counsel was ineffective for not presenting Dr. Barnes's testimony.

## 2.    Failure to present testimony of pediatric neurologist

Baker also claims his trial counsel was ineffective for failing to present expert testimony of a pediatric neurologist like Dr. Scheller, who Baker retained post-conviction. Baker filed Dr. Scheller's declaration in support of Baker's petition. In this declaration, Dr. Scheller attested he had reviewed G.B.'s medical records and concluded, among other things, that G.B. did not have any visible signs of child abuse; her head circumference indicated she had a "chronic buildup of fluid"; the medical personnel could have easily caused the bruise on her head; "there was no evidence of trauma or violent shaking"; "it is very unlikely that she was a victim of abusive head trauma that day"; and she had a seizure and died "because her brain blood flow and oxygen needs were not met." Regarding CVT, Dr. Scheller attested that the CT scan showed "at least 2 clotted cortical veins" but that "the appropriate MR techniques to look for blood clots . . . were not done" and "the appropriate tests to investigate the cause of the clots were not done."

In his petition, Baker alleged an expert like Dr. Scheller could have explained the clotting found on the scans and offered his opinion as to the possible natural causes of G.B.'s death. Further, Baker alleged that if counsel had investigated and presented an expert like Dr. Scheller, there was a "reasonable probability" "the result would have been different" because the case "was razor thin."

The district court ruled that Baker "provided no admissible evidence" that Dr. Scheller or another expert "could have testified that pre-existing blood clots" "provided an alternative explanation for [the] death." Further, the court ruled that "Baker did not explain how the rate of G.B.'s head circumference might provide an alternative explanation of her death." The court noted Baker's trial counsel was aware that expert testimony can be used to cast reasonable doubt but that he still "reasonably could have decided that additional testimony regarding this point would not be productive" or would be diluting, distracting, or harmful.

On appeal, Baker argues only that the district court "erred by downplaying the importance of expertise from a pediatric neurologist." This argument is without merit for several reasons. First, many of Dr. Scheller's opinions are merely redundant of other testimony presented at trial including, for example, that G.B. did not have any visible signs of child abuse; the medical personnel could have easily caused the bruise on her head; "there was no evidence of trauma or violent shaking"; "it is very unlikely that she was a victim of abusive head trauma that day"; and she died "because her brain blood flow and oxygen needs were not met."

16

Second, a pediatric neurologist did not testify for the prosecution. Consequently, that Baker's trial counsel did not investigate a pediatric neurologist as a potential expert to counter the State's evidence is objectively reasonable. Further, no evidence indicates trial counsel had any information to suggest the circumference of G.B.'s head and a "chronic buildup of fluid" was a potential issue. Finally, Dr. Scheller's opinion that the appropriate steps were not taken to look for clots and to determine their cause was not helpful to Baker's defense that CVT existed before G.B. was admitted to the hospital. Accordingly, the district court did not err by summarily dismissing Baker's claim that his trial counsel was ineffective for failing to investigate a pediatric neurologist like Dr. Scheller.

### 3. Failure to object to closing argument

Baker argues his trial counsel was ineffective for failing to object to the prosecutor's closing argument vouching for Keim's credibility and misstating the evidence regarding Dr. Hua's testimony. Evaluating whether trial counsel's performance was deficient for failing to object to the prosecutor's statements initially turns on whether those statements were outside the permissible bounds of proper closing argument. In other words, a prosecutor's statement must be objectionable before trial counsel's failure to object to the statement can be considered deficient performance.

As a general rule, both the prosecution and the defense have traditionally been afforded considerable latitude in closing arguments to the jury and are entitled to discuss fully, from their respective standpoints, the evidence and the inferences to be drawn therefrom. *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007). "Considerable latitude, however, has its limits, both in matters expressly stated and those implied." *Id.* For example, a closing argument may not misrepresent or mischaracterize the evidence, unduly emphasize irrelevant facts introduced at trial, or refer to facts not in evidence. *Id.* Additionally, "closing argument should not include counsel's personal opinions and beliefs about the credibility of a witness." *Id.* A prosecutor may, however, express an opinion as to the truth or falsity of testimony when that opinion is based on the evidence. *State v. Timmons*, 145 Idaho 279, 288, 178 P.3d 644, 653 (Ct. App. 2007). If a statement is a reasonable inference from the evidence presented, then it is not a misstatement of the evidence. *State v. Saenz*, 167 Idaho 443, 453, 470 P.3d 1252, 1262 (Ct. App. 2020).

17

In analyzing whether trial counsel should have objected to a statement, there is a strong presumption that counsel's performance was within the acceptable range particularly regarding the absence of objections, which are generally considered to fall within the realm of tactical or strategic decisions. *Giles v. State*, 125 Idaho 921, 924, 877 P.2d 365, 368 (1994). "This Court has long-adhered to the proposition that tactical or strategic decisions of trial counsel will not be second-guessed on appeal unless those decisions are based on inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation." *Gonzales v. State*, 151 Idaho 168, 172, 254 P.3d 69, 73 (Ct. App. 2011). "Choosing not to bring additional attention to statements made in closing arguments does not equate to inadequate preparation, ignorance of the law, or other shortcomings." *State v. Hall*, 163 Idaho 744, 834, 419 P.3d 1042, 1132 (2018).

During closing argument in this case, the prosecutor argued the jury should believe Keim's testimony:

> You should believe Brian Keim. His statements are consistent. He's never given false testimony. He was corroborated by all of the other evidence, the medical evidence, and there's no motive for him to lie.

Additionally, the prosecutor argued about the meaning of Dr. Hua's testimony that G.B. "was alive" when she had CVT:

> There has been a theory posited that she had a cortical vein thrombosis or this blood clot prior to her death.
> Well, guess what? She did. She did have a blood clot prior to her death because she was on life support for four days and that's when it developed. And so when Dr. Hua, when he's asked directly, Did she have a CVT prior to cardiac arrest? He said, She was alive. That's all he's going to say. Because she wasn't taken off life support until the 14th [of May]. The heart doesn't stop pumping blood with the aid of that machine until the 14th.

In his petition, Baker alleged his trial counsel should have objected to these arguments. Thereafter, however, trial counsel testified during his deposition that, "I almost never object to closing argument." He explained his theory that jurors "are going to go back and they are going to look at their notes. They are going to find out whether this is true or not." The district court rejected Baker's argument that trial counsel was ineffective for failing to object to closing argument, ruling that the arguments were a reasonable inference from the evidence and that trial counsel made a tactical decision "not to highlight closing arguments by making objections."

On appeal, Baker argues simply that "this issue is like the one in *Stanfield v. State*, [165 Idaho 889, 899,] 454 P.3d 531, 541 (Idaho 2019)." In that case, Stanfield argued her lawyers

18

were ineffective for failing to object to the prosecutor's closing statements that shifted the burden of proof to her. *Id.* at 898, 454 P.3d at 540. The Idaho Supreme Court ruled that "a prosecutor commits misconduct when he diminishes or distorts the State's burden to prove the defendant's guilt beyond a reasonable doubt." *Id.* at 899, 454 P.3d at 541. The Court concluded that the prosecutor's statements were akin to arguing the defense's failure to explain a weakness requires a guilty verdict and implied the defendant was not presumed innocent. *Id.* Further, the Court concluded that "it is unlikely that the failure to object was tactical or strategic, as it appears unlikely that having the prosecutor imply that your client holds the burden of proof would ever be a reasonable tactical decision." *Id.*

This case is distinguishable from *Stanfield* for several reasons. First, the burden of proof in this case is not implicated by the prosecutor's closing arguments, which Baker challenges. Second, Baker's trial counsel specifically testified that he made the strategic, tactical decision not to object during closing argument, and Baker has neither argued nor shown that this decision was not objectively reasonable. Finally, the prosecutor's arguments were reasonable inferences from the evidence.

Contrary to Baker's argument, the prosecutor did not personally vouch for Keim's credibility. Rather, she argued the evidence supported the conclusion that he was credible, pointing to the corroboration of the medical evidence, the lack of evidence of any prior false testimony, and the lack of a motive to lie. Although Baker learned information post-conviction that may have undermined this closing argument and Keim's credibility as discussed below, Baker's trial counsel was unaware of this information at the time of closing argument. At trial, the evidence at least inferred, as the prosecutor argued, that Keim did not have a motive to lie and had not previously given false testimony and that the medical evidence corroborated his testimony.

Likewise, the prosecutor's statement about Dr. Hua's testimony was a fair inference from the evidence. Specifically, Dr. Hua testified on cross-examination:

> Q.     [D]o you have an opinion to a reasonable degree of medical certainty as to whether the lines of Zahn in that photograph indicate whether or not the child had that thrombus prior to cardiac arrest?
> A.     She was alive.

This testimony supported the prosecutor's closing argument that Dr. Hua did not testify, at least in response to this question, that the blood clotting existed before G.B. was admitted to the hospital; rather, his answer suggested it formed after she was placed on life support.

Baker's trial counsel testified he made a strategic decision not to object during closing argument. The prosecutor's statements, which Baker's challenges, are supported by a fair inference from the evidence at the time of trial. As a result, trial counsel's decision not to object was objectively reasonable, and the district court did not err by summarily dismissing Baker's claim that trial counsel provided ineffective assistance by failing to object to closing argument.

### B. *Brady* Claim

Baker challenges the district court's summary dismissal of his *Brady* claim which alleges the State violated his constitutional rights by failing to produce certain information related to Keim which would have led to impeachment evidence. Specifically, Baker alleged in his petition that the State failed to alert him that Keim had been a witness in another murder case in November 2011 and to disclose documents from Keim's central file maintained by the Idaho Department of Correction (IDOC) related to Keim's testimony in that murder case, *State v. Meister*, CR-02-01534 (hereafter "*Meister* testimony"). These documents included a cover letter, a subpoena, and an order to transfer Keim to Latah County for the murder trial in *Meister*.

Baker obtained these documents post-conviction from Keim's IDOC file through a public records request, and they led him to discover Keim's *Meister* testimony. At the *Meister* trial, Keim testified about another inmate's alleged murder confession. Specifically, Keim testified that while he was incarcerated with Lane Thomas, Thomas confessed to committing the murder for which Meister was on trial. Keim gave this testimony in November 2011--about five months after Keim had reported to Detective Oster in June 2011 that Baker had confessed to murdering G.B.

After Baker filed his petition, his *Brady* claim expanded when the State produced the five CDs containing recordings of Keim's telephone calls while incarcerated in 2011-2012. In one of these calls (hereafter "jailhouse call"), Keim discussed his testimony in a murder trial in Latah County and his transfer to SAWC. Specifically, he told the unidentified individual to whom he was speaking:

> Yeah, this place I'm at now, it's alright. It's like a minimum security--I'll be able to get a pretty good job, but it might take a couple of months, like two or three months or so. And well, I was trying to get to a CWC, like a work center, but

they might not--they might not take me to one of them because I've got a f--king [escape 00:10:25]. *But I'm not supposed to be [here] if I got an escape*[4] *either, but they made an exception for it*, you know. So--yeah, shit, for like two months I was gone--in county jails, man. F--king, *I had to go to Latah County because somebody I knew from prison had his lawyers subpoena me to be a witness in his case. So I was a witness in a murder trial*.

(Emphasis added.)

Rather than amending his petition to allege the State's failure to produce this jailhouse call constituted another *Brady* violation, Baker included the claim in his motion for partial summary disposition of his *Brady* claim, attaching a transcript of the jailhouse call to his supporting papers.[5] Based on this newly disclosed evidence and other information submitted in support of his motion for partial summary disposition, Baker argued he had established a meritorious *Brady* claim warranting disposition in his favor. Alternatively, Baker filed an amended response to the State's motion for summary dismissal, arguing he had at least presented sufficient evidence to warrant an evidentiary hearing.

Following the summary dismissal hearing, the district court dismissed Baker's *Brady* claim. In its written ruling, the court identified only Keim's *Meister* testimony as the undisclosed evidence at issue. It ruled Keim's *Meister* testimony would have been favorable evidence for Baker, reasoning evidence that "a second prisoner confessed to [Keim] would have assisted [Baker] in casting doubt on [Keim's] testimony by making it seem unlikely that such confessions could happen twice." Further, the court ruled the State suppressed this evidence, noting the State conceded it could not prove "it produced any documentation of [Keim's *Meister*] testimony."

The district court ruled, however, that the State's suppression of favorable evidence did not prejudice Baker for two reasons. First, the court concluded "Keim's character and status as a

---

[4] In support of Baker's motion for partial summary disposition, he attached a copy of the transcript of Keim's *Meister* testimony. During the *Meister* trial, Keim testified that he had escaped from incarceration twice, once from prison in Michigan and once from jail in Oregon.

[5] On appeal, the State argues Baker failed to allege in his petition that the prosecutor's suppression of the jailhouse call constituted a *Brady* violation. At the time of his petition, however, Baker was not yet aware of the jailhouse call because the State had not yet produced it. Baker raised the issue in summary disposition briefing and argued it during the hearing. For this reason, the issue was properly before the district court.

jail-house forger[6] was already attacked" based on Baker's attempt to undermine Keim's veracity at trial. The court reasoned that:

> It is unlikely that one additional fact casting doubt on his testimony would have made a difference to the jury. Most of them would have had a low opinion of [Keim's] testimony through the effectiveness of [Baker's] trial counsel. For those who were still hold-outs believing [Keim], the additional point about the additional [*Meister*] testimony would not have dislodged the hold-outs.

Second, the district court reasoned that Baker was not "convicted solely on the weight of [Keim's] testimony," explaining that Keim testified "for only about an hour" in contrast to medical experts' "days of testimony" and that if Keim had not testified at all, "the State's case was much the same" if not "better." The district court's ruling, however, did not address whether the State's failures to alert Baker of Keim's status as a witness in another murder case and to produce the IDOC file documents and the jailhouse call constituted a *Brady* violation. The court did not rule whether the State had suppressed that information, whether the information was favorable to Baker, or whether it prejudiced Baker.

On appeal, Baker challenges the district court's analysis of his *Brady* claim, arguing the court "failed to apply the correct federal constitutional standard for assessing prejudice" when ruling on his *Brady* claim. In response, the State contends the court correctly dismissed Baker's *Brady* claim, but the State asserts the court incorrectly analyzed the claim. We agree the court erred in its analysis of Baker's *Brady* claim, including by not applying the correct standard for determining prejudice.

The following legal principles govern the analysis of a *Brady* claim. "Due process requires all material exculpatory evidence known to the State or in its possession be disclosed to the defendant." *Dunlap*, 141 Idaho at 64, 106 P.3d at 390. Establishing a *Brady* violation requires a three-part showing: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the State must have suppressed that evidence, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Thumm v. State*, 165 Idaho 405, 422, 447 P.3d 853, 870 (2019) (same); *Dunlap*, 141 Idaho at 64, 106 P.3d at 390 (same).

---

[6] The district court's reference to Keim as a "jail-house forger" relates to Keim's acknowledgement during direct examination at Baker's trial that he had forged documents for incarcerated sex offenders to indicate their convictions were for something other than sex offenses.

22

Evidence is favorable if it is exculpatory or impeaching. *Strickler*, 527 U.S. at 281-82; *see also Dunlap*, 141 Idaho at 64, 106 P.3d at 390 ("Impeachment evidence should be viewed in the same manner as exculpatory evidence."). Favorability generally turns on whether the undisclosed evidence at issue is damaging to the prosecution's case. *See Kyles v. Whitley*, 514 U.S. 419, 444-45 (1995) (analyzing undisclosed evidence's "damage" to prosecution's case). The United States Supreme Court has described favorability for purposes of a *Brady* analysis in various different ways. For example, "evidence [is] favorable to an accused [such] that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is favorable if it would have "raised opportunities to attack" the thoroughness, reliability, or good faith of the State's investigation. *Kyles*, 514 U.S. at 445-46. Evidence is favorable when the impeaching nature is apparent from the contrast between the witness's trial testimony and the undisclosed evidence. *Strickler*, 527 U.S. at 282 (comparing undisclosed document's contents with trial testimony). Evidence is also favorable if its disclosure "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441. For example, if the value of the State's "witnesses would have been substantially reduced or destroyed" by the undisclosed evidence, then that evidence is favorable. *Id.*

The prosecution has an affirmative duty to disclose favorable evidence to the defendant, and a failure to disclose such evidence is an unlawful suppression, regardless of a prosecutor's good or bad faith. *Id.* at 432. The duty of disclosure enunciated in *Brady* is an obligation of not just the individual prosecutor assigned to the case, but of all the government agents having a significant role in investigating and prosecuting the offense. *State v. Avelar*, 132 Idaho 775, 781, 979 P.2d 648, 654 (1999); *Queen v. State*, 146 Idaho 502, 505, 198 P.3d 731, 734 (Ct. App. 2008). A prosecutor, however, "is not required to disclose evidence the prosecutor does not possess or evidence of which the prosecutor could not reasonably be imputed to have knowledge or control." *Avelar*, 132 Idaho at 781, 979 P.2d at 654 (internal quotation marks omitted); *Queen*, 146 Idaho at 505, 198 P.3d at 734.

The United States Supreme Court in *Kyles* has held that "the state's obligation under [*Brady*] to disclose evidence favorable to the defense turns on the cumulative effect of all such evidence suppressed by the government." *Kyles*, 514 U.S. at 421. "[T]he prosecutor remains

responsible for gauging that effect regardless of any failure by the police to bring favorable evidence to the prosecutor's attention." *Id.* As the *Kyles* Court ruled:

> [S]howing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, failure to disclose is in good faith or bad faith) the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Id.* at 437-38 (internal citation omitted).

Unlawful suppression occurs if a prosecutor violates the duty to disclose favorable evidence. A prosecutor's violation of the duty to disclose favorable evidence, however, only constitutes a *Brady* violation if prejudice ensues:

> Prejudice is shown where the favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different. A reasonable probability of a different result is accordingly shown when the government undermines the confidence in the outcome of the trial.

*Thumm*, 165 Idaho at 422, 447 P.3d at 870 (internal quotation marks and citations omitted).

The United States Supreme Court has also referred to the element of prejudice as "materiality." *See also Kyles*, 514 U.S. at 433 (referring to materiality); *Bagley*, 473 U.S. at 682 (same). In *Kyles*, the Court explained "four aspects of materiality." First, "materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. Rather, the "touchstone of materiality is a 'reasonable probability' of a different result." *Id.* (quoting *Bagley*, 473 U.S. at 682). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *see also Kyles*, 514 U.S. at 434 (same). Second, "materiality . . . is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35. Rather, showing a *Brady* violation requires "showing that the favorable evidence could reasonably be taken to put

the whole case in such a different light as to undermine the confidence in the verdict." *Id.* at 435. Third, once a reviewing court finds a constitutional error, "there is no need for further harmless-error review" because the error "cannot subsequently be found harmless." *Id.* at 435-36. Finally, determining the materiality of suppressed evidence requires consideration of the suppressed evidence "collectively, not item by item." *Id.* at 436. Despite this requirement, however, the trial court must "evaluate the tendency and force of undisclosed evidence item by item." *Id.* at 436 n.10.

In this case, the district court failed to apply the correct standard for analyzing prejudice, namely whether the State's suppression of evidence created a reasonable probability sufficient to undermine the confidence in the trial's outcome. *See Bagley*, 473 U.S. at 682 (holding a "reasonable probability" is a probability sufficient to undermine confidence in the outcome); *see also Kyles*, 514 U.S. at 434 (same). The court did not articulate this standard when ruling that Baker had failed to establish prejudice. Rather, the court ruled that prejudice was lacking because Baker "attempted to undermine [Keim's] veracity" and that "it is unlikely one additional fact casting doubt on [Keim's] testimony would have made a difference to the jury." Further, the court diminished the importance of Keim's testimony based on the length of that testimony relative to the entire trial and the court's own view of Keim's credibility as "a dubious witness."

The district court's analysis is more akin to a sufficiency of the evidence analysis which the United States Supreme Court rejected in *Kyles*. *See Kyles*, 514 U.S. at 434 (ruling materiality "is not a sufficiency of evidence test"). Additionally, the district court's analysis also turns on an improper consideration of Keim's credibility as a "dubious" witness.[7] Whether a witness is credible is exclusively within the jury's province. *State v. Jones*, 145 Idaho 639, 641, 181 P.3d 1247, 1249 (Ct. App. 2008) ("Credibility determinations are within the province of the jury."). Conceivably, the jury found Keim's testimony credible because it convicted Baker.

Moreover, the district court's finding that "one additional fact" would not have cast further doubt on Keim's veracity improperly weighs the significance of Keim's testimony about Baker's confession. As the United States Supreme Court has previously noted, a defendant's confession has a significant impact on a jury:

---

[7] The district court judge who ruled on Baker's post-conviction claims is not the same judge who presided over Baker's underlying trial, and as a result, the district court judge did not observe Keim testify against Baker.

> A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so. While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision.

*Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (internal quotation marks omitted).

The district court also erred by failing to analyze the undisclosed evidence item by item. *See Kyles*, 514 U.S. at 436 n.10 (requiring court to "evaluate the tendency and force of the undisclosed evidence item by item"). Specifically, the court did not address the State's failures to alert Baker that Keim had previously testified in a murder case, to disclose the documents from Keim's IDOC file, or to disclose the jailhouse call. Baker argued the State failed to disclose all this information and presented support for these allegations including, for example, Keim's *Meister* testimony, a transcription of the jailhouse call, the deposition of Baker's trial counsel, and the declaration of another criminal defense attorney who attested to the importance of the undisclosed information to preparing a defense. These materials raise various factual issues, the resolution of which will require an evidentiary hearing.

The State contends Baker's allegations fail to establish any *Brady* claim, arguing that the documents from Keim's IDOC file and the jailhouse call are neither impeaching nor material and that Keim's *Meister* testimony meets none of the elements of a *Brady* claim. Based on this contention, the State argues this Court should affirm the district court's summary dismissal of Baker's *Brady* claim under the right-result, wrong-theory rule. *See State v. Hoskins*, 165 Idaho 217, 221, 443 P.2d 231, 235 (2019) (explaining rule). We disagree and conclude Baker's *Brady* claim deserves a thorough and exacting evaluation after an evidentiary hearing to determine whether the State undermined confidence in the jury's verdict by suppressing favorable information, including that Keim has previously testified in a murder trial, the IDOC file documents,[8] and the jailhouse call.

---

[8] We note that the State contends the prosecutor had no *Brady* duty to obtain the IDOC file at all. That question, however, is for the district court to determine in the first instance.

In the context of this particular case and the specific facts Baker has already developed in the record, it is important to note that the impeachment value of the undisclosed evidence need not necessarily be apparent on the face of that evidence. The United States Supreme Court addressed this issue in *Kyles*. In that case, a jury found Kyles guilty of murdering a woman in a grocery store parking lot. *Kyles*, 514 U.S. at 423, 431. In support of a *Brady* claim, Kyles argued the State suppressed "the prosecution's list of cars in . . . the parking lot at mid-evening after the murder." *Id.* at 450. The State argued that "the list was neither impeachment nor exculpatory evidence." *Id.* The Court rejected this argument, stating it "confuses the weight of the evidence with its favorable tendency." *Id.* The Court noted the list "had some value as exculpation and impeachment" because it would have helped Kyles to counter the police's argument that his vehicle was at the crime scene and to establish that either the police knew the list was inconsistent with their informant's statements, or they had failed to "check the informant's story against [a] known fact." *Id.* In other words, the impeachment value of the list turned on the State's presentation of facts contradicting the list. The United States Supreme Court also noted that the exculpatory value of evidence may turn on the evidence's effective use and the opportunities it raises to challenge the thoroughness of the State's investigation. *Id.* at 445-46 (ruling evidence is favorable if it would have "raised opportunities to attack" thoroughness, reliability, or good faith of State's investigation); *see also Bagley*, 473 U.S. at 676 ("Evidence [is] favorable to an accused [such] that, if disclosed and used effectively, it may make the difference between conviction and acquittal.").

Despite that the potential impeachment value of Keim's status as a witness in another murder trial, the IDOC file documents, and the jailhouse call[9] may not have been readily apparent, numerous facts particular to this case warrant an evaluation of that evidence under *Brady* and its progeny. For example, the evidence Baker has developed post-conviction may have prevented the prosecutor from arguing in closing argument that there was no evidence Keim had previously testified falsely or had received anything in exchange for his testimony.

---

[9] As Baker argued before the district court, the potential value of the jailhouse call is twofold. First, Keim's disclosure in the jailhouse call that he testified in Latah County in a murder trial may have been favorable if it led Baker's trial counsel to discover Keim's *Meister* testimony. Second, Keim's statement during the call that "they made an exception" for his transfer to SAWC may have directly impeached his trial testimony that the State did not give him anything in exchange for his testimony.

27

*See Kyles*, 514 U.S. at 444 (noting undisclosed evidence's "likely damage" is "best understood" by whether undisclosed evidence contradicted prosecutor's closing argument). The prosecutor's strategic decision to present facts related to these arguments and to make them during closing argument may have heightened the prosecutor's obligation to investigate their veracity, thereby implicating the thoroughness of the State's investigation into Keim. *See id.* at 445 (noting undisclosed evidence would have damaged prosecution's case if it revealed State's investigation lacked thoroughness). Also, Keim's statement that "they made an exception" for his transfer to SAWC despite his escape record, the C-Note indicating he did not qualify for a transfer to SAWC under the matrix system, and the timing of his transfer to SAWC all collectively could suggest Keim's willingness to testify against Baker may have had a favorable impact on his transfer. Also, Keim's *Meister* testimony was readily discoverable by post-conviction counsel based on the sole fact that Keim had testified in a murder trial in Latah County. Based on this record, an evidentiary hearing will be required on remand to resolve factual issues including, for example, identifying the undisclosed evidence of which the prosecutor reasonably had actual or imputed knowledge or control and determining the nature of the State's investigation into Keim.

## C.    Claim of Actual Innocence

Finally, Baker challenges the district court's dismissal of his "freestanding claim of actual innocence" under I.C. § 19-4901(a)(4), Art. I, Sec. 13 of the Idaho Constitution, and the Fourteenth Amendment to the United States Constitution. Baker acknowledges, however, that "the United States Supreme Court has not yet decided whether a freestanding innocence claim exists under the federal Constitution." Further, he acknowledges he "is unaware of an Idaho case directly answering this question of whether a freestanding claim of innocence lies under the Idaho Constitution." Nevertheless, he urges this Court to "find that a freestanding claim of actual innocence exists under the state and federal constitutions." This Court's role, however, is not to recognize new constitutional claims not previously recognized by either the United States Supreme Court or the Idaho Supreme Court. Accordingly, we affirm the district court's summary dismissal of Baker's unrecognized claim of actual innocence.

## IV.

## CONCLUSION

We affirm the district court's summary dismissal of Baker's ineffective assistance of counsel claims and his claim of actual innocence. We reverse, however, the district court's

summary dismissal of Baker's *Brady* claim and remand for an evidentiary hearing consistent with this opinion.

Chief Judge HUSKEY and Judge GRATTON **CONCUR**.